**DKT MEMORIAL FUND LTD., et al., Appellees,**

**v.**

**AGENCY FOR INTERNATIONAL DEVELOPMENT, et al., Appellants.**

**DKT MEMORIAL FUND LTD., et al., Appellants,**

**v.**

**AGENCY FOR INTERNATIONAL DEVELOPMENT, et al., Appellees.**

Nos. 88–5243, 88–5266.

United States Court of Appeals, District of Columbia Circuit.

Argued April 13, 1989.

Decided Oct. 10, 1989.

As amended Oct. 10, 1989.

James F. Fitzpatrick, with whom Michael T. Shor, Gwyn F. Murray, Richard A. Frank and Michael E. Fine, Washington, D.C., were on the brief, for appellants/cross appellees.

Neil H. Koslowe, Atty., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and William Kanter, Deputy Director, Dept. of Justice, Washington, D.C., were on the brief, for appellees/cross appellants.

Walter B. Slocombe, Ass'n for Voluntary Surgical Contraception, et al., Washington, D.C., with whom Janet Benshoof and Rachael N. Pine, American Civil Liberties Union, New York City, were on the joint brief, for amici curiae urging reversal.

Before RUTH BADER GINSBURG and SENTELLE, Circuit Judges, and

RE.*

Opinion for the Court filed by Circuit Judge SENTELLE.

Opinion, concurring in part and dissenting in part, filed by Circuit Judge RUTH BADER GINSBURG.

SENTELLE, Circuit Judge:

These consolidated cross-appeals arise from a decision of the United States District Court for the District of Columbia determining statutory and constitutional challenges to abortion-related executive restrictions on the use of population planning funds granted by the Agency for International Development ("AID") under the Foreign Assistance Act, 22 U.S.C. § 2151 *et seq.* ("FAA" or "the Act"). The District Court determined that the limitations survived the statutory attacks but found a part of them invalid on constitutional grounds. *DKT Memorial Fund Ltd. v. Agency for Int'l Dev.*, 691 F.Supp. 394 (D.D.C.1988). Plaintiffs, three organizations involved in population planning, appealed from the former determination, and AID from the latter. We, like the District Court, find the statutory arguments unmeritorious and affirm that portion of the District Court decision. As to the constitutional arguments, we conclude that some are without merit and that others were not properly before the Court. We therefore affirm in part, reverse in part, and remand for dismissal.

## I. BACKGROUND

A. *Statutory and Factual Background*

In the FAA, specifically 22 U.S.C. § 2151b(b), Congress authorized the President "to furnish assistance, on such terms and conditions as he may determine, for voluntary population planning." Section 2151b(f)(3) of the Act provides that "[n]one of the funds made available to carry out this subchapter may be used to pay for any biomedical research which relates, in whole or in part, to methods of, or the perform-

ance of, abortions or involuntary sterilization as a means of family planning." With certain exceptions, the President delegated the functions and allocation of funds authorized by 22 U.S.C. § 2151b(b) to the Director of the United States International Development Cooperation Agency ("IDCA") in 1979. Executive Order No. 12,163, 44 Fed.Reg. 56,673 (1979). The Director, in turn, delegated that authority to the Administrator of AID. IDCA Delegation of Authority No. 1, 44 Fed.Reg. 57,521 (1979), as amended 45 Fed.Reg. 74,090 (1980).

In 1984, President Reagan announced certain abortion-related policy limitations on the use of family planning foreign aid funds. The Reagan Administration presented these new limitations at a United Nations sponsored International Conference on Population in Mexico City. These new limitations thus became known as the Mexico City Policy. *See* Policy Statement of the United States of America at the United Nations International Conference on Population (Second Session), Mexico, D.F., August 6–13, 1984. The Mexico City Policy states in part:

> The United Nations Declaration of the Rights of the Child [1959] calls for legal protection for children before birth as well as after birth. In keeping with this obligation, the United States does not consider abortion an acceptable element of family planning programs and will no longer contribute to those of which it is a part. Accordingly, when dealing with nations which support abortion with funds not provided by the United States Government, the United States will contribute to such nations through segregated accounts which cannot be used for abortion. Moreover, the United States will no longer contribute to separate nongovernmental organizations which perform or actively promote abortion as a method of family planning in other nations. With regard to the United Nations Fund for Population Activities

---

* Chief Judge, United States Court of International Trade, sitting by designation pursuant to 28 U.S.C. § 293(a).

[UNFPA], the U.S. will insist that no part of its contribution be used for abortion. The U.S. will also call for concrete assurances that the UNFPA is not engaged in, or does not provide funding for, abortion or coercive family planning programs; if such assurances are not forthcoming, the U.S. will redirect the amount of its contribution to other, non-UNFPA, family planning programs.

AID's foreign aid population assistance activities include all programs described in the Mexico City Policy. After the announcement of that policy, AID developed proposed clauses implementing the Mexico City Policy for insertion in the grant and cooperative agreement documents to be entered between AID on the one hand and foreign governments or domestic and foreign nongovernmental organizations ("DNGOs" and "FNGOs") on the other. Implementing contract clauses with FNGOs require that each grant recipient certify that "it does not now and will not during the term of this grant perform or actively promote abortion as a method of family planning in AID-recipient countries or provide financial support to any other foreign nongovernmental organization that conducts such activities." AID Handbook 13 at 4D–54. Thus, a foreign NGO, during the term of an AID-population assistance grant, is prohibited from using its own funds to perform or actively promote abortion as a method of family planning abroad.

A DNGO receiving an AID grant or cooperative agreement must certify that it "will not furnish assistance for family planning *under this grant* to any foreign nongovernmental organization which performs or actively promotes abortion as a method of family planning in A.I.D.-recipient countries or which provides financial support to any other foreign nongovernmental organization that conducts such activities." AID Handbook 13 at 4C–48 (emphasis add-

ed). Thus, DNGOs are prohibited from using grant funds, not their own, for the promotion of abortion in AID-recipient countries.[1]

As we will set out below, the current litigation attacks all the Mexico City Policy implementing limitations on the use of AID funds by NGOs for foreign population assistance.

### B. *The Proceedings to Date*

DKT Memorial Fund Ltd. ("DKT"), a DNGO, together with two FNGOs, Parivar Seva Sanstha, of India ("PSS"), and Population Services Family Planning Programmes, Ltd., of England ("PSFP") (all collectively "plaintiffs"), brought the present action in 1985, seeking a declaratory judgment that AID's policy is invalid as violative of (1) plaintiffs' First Amendment speech and association rights, (2) the FAA, and (3) the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA").[2] Initially, the District Court dismissed the action for lack of standing, also suggesting, in dicta, that the suit presented nonjusticiable political questions. *DKT Memorial Fund Ltd. v. Agency for Int'l Dev.*, 630 F.Supp. 238 (D.D.C.1986). We reversed, rejecting the District Court's dicta that the suit presented nonjusticiable political questions, granting leave to amend the complaint, and directing further proceedings on the question of standing under the amended complaint, together with appropriate proceedings for disposition on the merits, if standing was then found. *DKT Memorial Fund Ltd. v. Agency for Int'l Dev.*, 810 F.2d 1236 (D.C. Cir.1987).

The District Court, thereafter, heard the matter on cross-motions for summary judgment, and entered the order which is the subject of the present appeal. *DKT Memorial Fund Ltd. v. Agency for Int'l Dev.*, 691 F.Supp. 394 (D.D.C.1988). The District

---

**1.** The definition of "abortion [as] a method of family planning" excludes those "performed if the life of the mother would be endangered if the fetus were carried to term [and] abortions performed following rape or incest (since abortion under these circumstances is not a family planning act)." AID Handbook 13 at 4C–51. For the sake of brevity, hereinafter the terms

"abortion," "abortion-related" and the like will refer to "abortions for family planning" unless the context indicates otherwise.

**2.** Plaintiffs asserted other grounds for invalidity of the Policy which were not brought forward on appeal.

Court concluded that plaintiffs had standing to raise the statutory attacks, but that the President had the power under the FAA to impose the limitations announced in the Mexico City Policy. *Id.* at 397–403. The Court further concluded that the foreign plaintiffs had no First Amendment rights and therefore no standing to assert a violation of such rights. *Id.* at 406. The Court further concluded, however, that the limitations under review did violate the First Amendment rights of DKT and granted an injunction prohibiting AID's use of the abortion-related limitations on grant funds. Plaintiffs and AID cross appealed from holdings adverse to their respective positions.

## II. The Statutory Claims

### A. *The Foreign Assistance Act*

We consider first plaintiffs' claim that the Mexico City Policy and the implementing clauses run afoul of the FAA. Their argument is two-pronged. First, they contend the challenged funding eligibility policy contravenes the statutory purposes of the Act and, thereby, exceeds executive authority. Second, they contend that the Executive, by adopting abortion-related restrictions more stringent than those set out in the Act, "contravenes the limits Congress established" and that the executive restrictions are, therefore, invalid. Brief for Appellant at 27. The District Court correctly ruled that both these arguments are without merit.

As to the first, that is, that the present executive practice is inconsistent with the general legislative policy, plaintiffs rely principally on statements of policy in 22 U.S.C. §§ 2151b(a), 2151–1(b), 2151u(a). The first of these, section 2151b(a), sets forth Congress's general finding that:

> effective family planning depends upon economic and social change as well as the delivery of services and is often a matter of political and religious sensitivity. While every country has the right to determine its own policies with respect to population growth, voluntary planning programs can make a substantial contribution to economic development, higher living standards, and improved health and nutrition.

Section 2151–1(b)(1) adds certain principles governing assistance. Among these principles are: "[m]aximum effort ... to stimulate the involvement of the people ... through the encouragement of democratic participation;" the administration of assistance "in a collaborative style to support the developmental goals chosen by each country receiving assistance," *id.* § 2151–1(b)(2); and that "United States cooperation in development should be carried out to the maximum extent possible through the private sector," *id.* § 2151–1(b)(8). Additionally, plaintiffs contend that the policy is inconsistent with section 2151u(a), in which Congress finds that "activities planned and carried out by private and voluntary organizations and cooperatives," are favored. Specifically, plaintiffs point to the phrase from that section: "it is in the interest of the United States that such organizations and cooperatives expand their overseas development efforts without compromising their private and independent nature." *Id.* § 2151u(a). Plaintiffs contend that imposing the abortion-related limitations contravenes this stated objective.

To plaintiffs' rather general assertion that the present practice is invalid because it contravenes these goals of the statute, the short answer is that it does not. As to the general policy statement in section 2151b(a), neither the Mexico City Policy nor the implementing grant clauses evinces any interference with the congressionally desired right of every country "to determine its own policies with respect to population growth." *Id.* § 2151b(a). In fact, the Mexico City Policy specifically permits recipient foreign governments to continue to receive FAA funds in segregated accounts while conducting abortion-related activity with their own money.

As to the principles set out in section 2151–1(b), none of the cited subsections nor any other part of this or any other act expresses or implies a congressional intent

that the President shall grant all requested funds to *all* entities seeking "democratic participation" whether from the private sector or elsewhere. As to the expression of congressional intent in section 2151u(a), as the Second Circuit noted in rejecting this same challenge to these same limitations, that section "requires only that the Government consider the private and independent nature of private organizations which it utilizes," *Planned Parenthood Fed'n of America v. Agency for Int'l Dev.,* 838 F.2d 649, 654 (2d Cir.1988), not that they be immunized from any conditions on their grants. Nothing in the Mexico City Policy or the grant clauses in any fashion contravenes any of the cited findings or declarations of principle by Congress. Indeed, Congress in section 2151b(c)(1) expressly directed that "the President is authorized to furnish assistance, *on such terms and conditions as he may determine.*" 22 U.S.C. § 2151b(c)(1) (emphasis added). The only congressional limitation placed on this discretion is set forth in section 2151b(f). That section provides:

(1) None of the funds made available to carry out this subchapter may be used to pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions.

(2) None of the funds made available to carry out this subchapter may be used to pay for the performance of involuntary sterilizations as a method of family planning or to coerce or provide any financial incentive to any person to undergo sterilizations.

(3) None of the funds made available to carry out this subchapter may be used to pay for any biomedical research which relates, in whole or in part, to methods of, or the performance of, abortions or involuntary sterilization as a means of family planning.

*Id.* § 2151b(f). *See Planned Parenthood Fed'n,* 838 F.2d at 654. Obviously, the funding limitations under attack not only do not run afoul of the 2151b(f) limitations, but if anything, go further in the same direction.

■ This brings us to the second of plaintiffs' arguments: that the clause limitations are violative of the FAA. In this argument they contend that the present eligibility policy contravenes specific provisions of the Act by going further than the quoted statutory limitations. In support of this proposition, they further offer the legislative history of the 1973 amendment which added the original abortion-related restrictions to the FAA. In the course of that enactment, Senator Helms, principal sponsor of the amendment, observed, "[w]e could, in fact, go far beyond the present amendment and require all abortion activities, from whatever funds, to be stopped before our assistance could be received. But the present amendment does not do that." 119 Cong.Rec. 32,293 (1973). Plaintiffs then argue that Senator Helms's language indicates that Congress considered, but rejected, the policy now followed by the executive branch, and that executive policy is therefore in contravention of the act of Congress. This is simply not the case.

As the Second Circuit has observed, Senator Helms's statement

does not indicate that Congress "has spoken" on the issue of whether limitations may be imposed on the use of non-federal funds. At most, Senator Helms' statement indicates that Congress was aware that it *could* consider an amendment containing such limitations on non-federal funds, not that Congress considered, but chose not to adopt, such limitations.

*Planned Parenthood Fed'n,* 838 F.2d at 655 (emphasis in original).

Nothing in the statute as enacted or any reasonable interpretation of the words of the statute indicates an intent to limit the President's discretion "to furnish assistance, on such terms and conditions as he may determine," in the fashion argued by plaintiffs. 22 U.S.C. § 2151b(c)(1). We therefore conclude that the District Court correctly decided that subsection (f) only restricts the President's authority to furnish assistance in the enumerated circumstances. "It does not, however, imply that the President cannot impose any other restrictions as to abortion." *DKT Memorial*

*Fund Ltd.*, 691 F.Supp. at 403. Or, as another district court has concluded, "absent a specific limitation on the Executive's authority to condition disbursal of United States funds to foreign NGOs, it must be assumed that the Congress has left intact" presidential authority to place conditions or to refuse funding to these organizations. *Planned Parenthood Fed'n of America v. Agency for Int'l Dev.*, 670 F.Supp. 538, 544 (S.D.N.Y.1987), *aff'd in relevant part, Planned Parenthood Fed'n v. Agency for Int'l Dev.*, 838 F.2d 649 (2d Cir.1988).

B. *The Administrative Procedure Act*

█ Plaintiffs' second statutory attack is no stronger than the first. They contend that the clauses implementing the Mexico City Policy are "arbitrary and capricious" and should be set aside under the Administrative Procedure Act, specifically 5 U.S.C. § 706(2)(A). In plaintiffs' view, AID's "new abortion-eligibility policy" is arbitrary and capricious because "AID did not develop an evidentiary record or otherwise provide a reasoned basis for its abrupt reversal of 25 years of prior practice." Brief for Appellants at 32.[3]

AID offers several reasons why this argument is invalid. Among them, AID contends that the grant clauses are exempt from APA review under 5 U.S.C. §§ 553(a)(1) and (2) which create exceptions to rulemaking requirements for "foreign affairs function[s] of the United States"; and "matter[s] relating to agency management ... or grants...." Certainly, these arguments are not without at least colorable merit. *See National Wildlife Fed'n v. Snow*, 561 F.2d 227 (D.C.Cir.1976) (applying grant exemption from rulemaking requirements to Federal Highway Administration regulations); and *WBEN, Inc. v. United States*, 396 F.2d 601, 616 (2d Cir.), *cert. denied*, 393 U.S. 914, 89 S.Ct. 238, 240, 21 L.Ed.2d 200 (1968) (applying exemption from rulemaking requirements for foreign affairs function of the United States). But the failure of this statutory attack is far more fundamental than either of those arguments.

Plaintiffs' attack on the "abrupt reversal of 25 years of prior practice" goes not to the grant clauses but to the presidential decision embodied in the Mexico City Policy itself. Thus, the decision involved is not a rulemaking by an agency, but rather a policy-making at the highest level by the executive branch. This attack does not go to the lawfulness of the policy, but rather its wisdom. In addition to the executive power vested by Article II of the Constitution, the President has power to make that change in policy, deriving from the broad language of 22 U.S.C. § 2151b(b) granting him discretion to furnish population planning assistance "on such terms and conditions as he may determine." The APA has never been construed to grant to this or any other court the power to review the wisdom of policy decisions of the President.

As we recently noted, in a different context:

> As the Supreme Court has stated of executive actions pursuant to express congressional grants of power, "[i]n such a case the executive action 'would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'"

*Palestine Information Office v. Shultz*, 853 F.2d 932, 937 (D.C.Cir.1988) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 688, 101 S.Ct. 2972, 2991, 69 L.Ed.2d 918 (1981), which quotes *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952)). As we further observed in *Palestine Information Office*,

> If the authority accorded the executive branch when acting pursuant to a congressional grant of power is great, it is greater still in the case at bar because the [executive branch] was acting in the field of foreign affairs.

*Id.*

In the present case, where the President acted under a congressional grant of discretion as broadly worded as any we are

---

**3.** Section heading; initial capitals omitted.

likely to see, and where the exercise of that discretion occurs in the area of foreign affairs, we cannot disturb his decision simply because some might find it unwise or because it differs from the policies pursued by previous administrations. Particularly is this so where the area in which he acts has expressly been recognized by Congress to be "a matter of political and religious sensitivity," 22 U.S.C. § 2151b(a), and where Congress almost five years after the announcement of the policy has enacted nothing indicating its sense that the President's acts go beyond the granted discretion.[4] *See generally Planned Parenthood Fed'n*, 838 F.2d at 655 (discussing congressional inaction following the announcement of the Mexico City Policy).

Indeed, at least one court has concluded, "that the broad statutory language ... [and] the nature of the act to be reviewed, in particular its inappropriateness for judicial review, indicate Congressional intent to preclude APA review of funding decisions under § 2151b(b)." *Allen Guttmacher Inst. v. McPherson*, 597 F.Supp. 1530, 1537 (S.D.N.Y.1984). In light of Circuit law stated in *DKT Memorial Fund Ltd.*, 810 F.2d at 1238, and *Population Inst. v. McPherson*, 797 F.2d 1062, 1068–70 (D.C. Cir.1986) (holding that the challenge to AID administrator's determination of eligibility for AID funds was not a nonjusticiable political question), we do not go so far as to preclude review. We can however state with confidence that plaintiffs in the present case have offered no basis upon which we should grant such a petition for review. Therefore, we affirm the District Court on this statutory issue.

### III. THE CONSTITUTIONAL CLAIMS

#### A. The Free Speech Claims and Standing of the Foreign NGOs

Foreign NGOs, PSS and PSFP claim that "AID's policy violates plaintiffs' protected First Amendment rights by rendering plaintiffs ineligible to receive population assistance funds because they engage in certain activities relating to voluntary abortion, including the dissemination of information, that run afoul of AID's policy, and by rendering plaintiffs unable to associate in AID programs with persons or entities whose abortion-related activities, including the dissemination of information, conflict with AID's policy." Amended Complaint at 10. In the complaint, plaintiffs do not differentiate between the asserted First Amendment rights of the FNGOs, PSS and PSFP and the DNGO, DKT. Initially, the District Court held that none of the plaintiffs had standing under the "case or controversy" requirements of Article III of the Constitution, as none of them had ever "applied to AID for funding and the challenged policy in no way prevent[ed] them from applying for funding." *DKT Memorial Fund Ltd.*, 630 F.Supp. at 242.

The Court concluded that plaintiffs were alleging at most a "subjective chill" which the Court held not to be " 'an adequate substitute for a claim of specific present objective harm or threat of future harm.' " *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)). As we noted above, we reversed the Court's initial standing decision, after permitting plaintiffs to amend their complaint to allege "that, but for the Policy, the appellants would be eligible to receive AID funds." *DKT Memorial Fund Ltd.*, 810 F.2d at 1239. We then remanded with instructions that the District Court further consider the "issue of standing in light of the amended complaint." *Id.*

On remand, plaintiffs, in their amended complaint, asserted that they had contracted jointly to conduct a four-year comprehensive planning project in Uttar Pradesh, India, that did not involve abortion in any respect. The project, plaintiffs allege, and AID admits at least for purposes of this litigation, would be eligible for population assistance funds, but for the fact that the

---

**4.** We are advertent to the caution that subsequent congressional inaction may not represent approval of the *status quo, see, e.g., Johnson v. Transportation Agency, Santa Clara County, California*, 480 U.S. 616, 669–72, 107 S.Ct. 1442, 1472–73, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting), but note that in the present case we are implying, not approval, but only absence of disapproval in light of the breadth of the prior congressional grant of discretion.

FNGOs, with their own funds, engage in voluntary abortion-related activities.[5]

The District Court concluded, and AID does not contest, that all plaintiffs had standing to assert the statutory claims. *DKT Memorial Fund Ltd.*, 691 F.Supp. at 397–401. The Court further held that the FNGOs had no standing to raise the constitutional claims, reasoning that foreign nationals outside the United States under neither the "control nor supervision" of the United States "have not shown sufficient ties to the United States [to] justify protection by our first amendment." *Id.* at 406.

On appeal, the FNGOs assert first that they satisfy the "case or controversy" requirements of Article III, in that they had " 'suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.' " *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)). But that is not the issue. The District Court recognized that a "case or controversy" existed for Article III purposes, but found that the FNGOs as nonresident aliens acting beyond the borders and control of the United States government were not within the zone of interests protected by our First Amendment and therefore personally lacked standing, whether or not the DNGO had such standing and whether or not the claim was otherwise cognizable.

Under our jurisprudence, "[a] court may 'refuse to determine the merits of a legal claim, on the ground that even though the claim may be correct the litigant advancing it is not properly situated to be entitled to its judicial determination.' " *NFFE v. Cheney*, 883 F.2d 1038, 1041 (D.C.Cir.1989) (quoting C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531, at 338–39 (1984)). That is to say, "[s]tanding focuses on the party and not on the issues sought to be adjudicated." *Id.* (citing *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968)). Even where the constitutional requirement of Article III standing is met, and a "case or controversy" is present, a particular plaintiff may still not have standing under the prudential requirements crafted by the judiciary. *See generally Center for Auto Safety v. NHTSA*, 793 F.2d 1322, 1328–1328–38 (D.C.Cir.1986).

What the present question requires, and what the District Court conducted, is an inquiry as to whether prudential standing exists: that is, whether the "plaintiff's complaint fall[s] within the 'zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Valley Forge Christian College*, 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)). The District Court obviously concluded that the interests in free speech and freedom of association of foreign nationals acting outside the borders, jurisdiction, and control of the United States do not fall within the interests protected by the First Amendment. It is that decision that we are called upon to review.

The FNGOs attempt to circumvent the question by restating it. They assert that "[t]he issue [is] whether U.S. government officials can ignore the First Amendment when they exercise authority over nonresident aliens...." Brief for Appellants at 37. This of course is not the issue at all. Before we can decide that government officials have improperly exercised their authority, or that improper exercise violates constitutional rights, we must find that a plaintiff with standing to assert the violation of rights is properly before the court.

---

5. Plaintiffs also include within their allegation of ineligibility the fact that DKT, the DNGO, engages in such activity. Obviously, however, under the terms of the Mexico City Policy and the grant clauses, this is immaterial to the eligibility of the Uttar Pradesh project since DNGOs are permitted to obtain grants under a segregated funds policy even if they engage in abortion-related activities with their own funds so long as they do not subgrant FAA funds to FNGOs engaging in the proscribed conduct.

*See generally Valley Forge Christian College, supra.*

We cannot say that the District Court's decision that the FNGOs are not such plaintiffs is without support in controlling precedent. For example, in *United States ex rel. Turner v. Williams,* 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979 (1904), the Supreme Court considered the claims of an alien barred from the United States as an "alien anarchist" under 32 Stat. 1213. The alien contended that the exclusionary act was violative of his rights under the First Amendment. In ruling against his claims, the Supreme Court stated that "those who are excluded [from the United States] cannot assert the rights in general obtaining in a land to which they do not belong as citizens or otherwise." *Id.* at 292, 24 S.Ct. at 723.

More recently in *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), a Marxist author was denied a visa to enter the United States under the authority conferred on the Attorney General by the Immigration and Nationality Act of 1952, 66 Stat. 182, 8 U.S.C. §§ 1182(a)(28)(D) and (G)(v), and 1182(d)(3)(A), to exclude aliens advocating, *inter alia,* world communism. The Court considered the challenge of certain United States nationals who asserted that their First Amendment rights to communicate with the alien were infringed. While rejecting the claim of the United States nationals on the other grounds, the Court accepted as a basic proposition that "it is clear that Mandel personally, as an unadmitted and nonresident alien, had no constitutional right of entry to this country as a nonimmigrant or otherwise." *Mandel,* 408 U.S. at 762, 92 S.Ct. at 2581. Significantly, Justice Douglas, while dissenting from the result reached by the Court, observed, "Mandel, an alien who seeks admission, has no First Amendment rights while outside the Nation." *Id.* at 771, 92 S.Ct. at 2586 (Douglas, J., dissenting). We offer *Turner* and *Mandel* by way of strong example and not exhaustion for the principle that aliens beyond the territorial jurisdiction of the United States are generally unable to claim the protections of the First Amendment. *See*

*generally United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950); *Galvan v. Press,* 347 U.S. 522, 530–32, 74 S.Ct. 737, 742–43, 98 L.Ed. 911 (1954); and *Harisiades v. Shaughnessy,* 342 U.S. 580, 592, 72 S.Ct. 512, 520, 96 L.Ed. 586 (1952).

Appellants point out, correctly, that *Turner, Mandel,* and the other authorities cited occur in the context of the exclusion of aliens. Nevertheless, the Supreme Court has never limited its absolute wording of the principle that nonresident aliens are without First Amendment rights, *e.g., Turner,* 194 U.S. at 292, 24 S.Ct. at 723, to the immigration context.

Further, plaintiffs and *amici curiae* appearing on their behalf offer cases in which aliens have asserted protections of Bill of Rights provisions other than the First Amendment. For example, in *United States v. Verdugo–Urquidez,* 856 F.2d 1214 (9th Cir.1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 1741, 104 L.Ed.2d 178 (1989), the Ninth Circuit upheld a nonresident alien's right under the Fourth Amendment to question the reasonableness of a search of his residence in Mexico conducted in part by United States agents. Similarly, in *United States v. Demanett,* 629 F.2d 862 (3d Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981), the Third Circuit considered a search conducted by the United States Coast Guard outside the territorial waters of the United States. That court, while noting the government had made no contention that either American citizens or Colombian nationals aboard the vessel lacked standing to claim the protection of the Fourth Amendment, assumed that all aboard the searched vessel were protected. *Id.* at 866.

Plaintiffs and their supporting *amici* argue *Verdugo–Urquidez* particularly strongly since it proceeds on the basis that the Constitution, in that case the Fourth Amendment, controls the actions of the government, and the government therefore cannot constitutionally act in a way violative of its normative principles either within or without its territorial borders. The *Verdugo–Urquidez* court particularly re-

lies on *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), which taught that:

> The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution.

*Id.* at 5–6, 77 S.Ct. at 1225 (footnote omitted).

The statement from *Reid v. Covert* is certainly not controlling on questions of alien rights, as it dealt with the government's power to reach out and punish a *citizen,* beyond its borders. Nonetheless, the normative notion expressed is not inconsistent with traditional American expectations that the government will act consistently with the provisions of the Constitution that give it existence wherever in the world the government may be acting. Or as Justice Harlan put it, concurring in the result in *Covert,* "[t]he powers of Congress ... are constitutionally circumscribed. Under the Constitution Congress has only such powers as are expressly granted or those that are implied as reasonably necessary and proper to carry out the granted powers." *Id.* at 66, 77 S.Ct. at 1256 (Harlan, J., concurring).

The difficulty with this argument is not that it is unconvincing, but rather that it does not address the question before us. As we have been at pains to note, our present concern is not the cause of action, or the legality of the government conduct, but rather the standing of the FNGOs to raise that cause of action and question that conduct in court. On this issue neither *Verdugo–Urquidez* nor the authority upon which it relies is helpful to the FNGOs' cause. The Ninth Circuit's standing analysis arose in the context of a nonresident alien being brought to the United States for trial on criminal charges. The Ninth Circuit expressly distinguished the alien exclusion cases cited above, and found standing to attack the search under the Fourth Amendment only after observing that the aliens in those cases were without the borders, whereas the government had brought Verdugo–Urquidez into the country to prosecute him in a United States court for violation of the laws of the United States. It was only in that context that the Ninth Circuit concluded that he had standing. *Verdugo–Urquidez,* 856 F.2d at 1221–24.

In short, even if we determined to follow the Ninth Circuit on its normative analysis of the effect of the Bill of Rights on extraterritorial conduct by the United States government—and certainly that analysis is well grounded in Supreme Court law and theory—we still can find in neither the Ninth Circuit decision nor the authorities on which it relies anything which takes the present case out of the zone of interest analysis discussed above. Given the language of the Supreme Court in the alien exclusion cases affording no First Amendment protection to aliens beyond the borders of the United States not within the custody or control of the United States, given nothing else to indicate that the aliens are within the "zone of interests to be protected or regulated by the statute or constitutional guarantee in question," *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), we cannot find that the District Court erred in holding that the FNGOs were without standing to assert the constitutional claims.

We will not, however, hold as the government urges, that an alien beyond the bounds of the United States never has standing to assert a constitutional claim. By way of comparison, in *Cardenas v. Smith,* 733 F.2d 909 (D.C.Cir.1984), we considered the claim of an alien against the United States Attorney General arising after a seizure of the alien's Swiss bank account allegedly triggered by acts of the Attorney General in violation of the Fourth and Fifth Amendments. While we reversed the District Court's grant of summary judgment in favor of the Attorney General, we did so stating:

> Nonetheless, we are not prepared today to conclude that Cardenas has standing to invoke the protection of the Constitution against actions of the American government. Given the difficulties and far-reaching consequences of a doctrine that enhances an alien's standing to put

on a constitutional mantle, we are reluctant to apply such a rationale to a case where the complaint is broadly drawn, the facts remain obscure, and where, in any event, such a conclusion may be unnecessary to the ultimate disposition of the plaintiff's claim.

*Id.* at 917. Similarly, in the present case, we are reluctant to announce a rule broader than that necessary to dispose of the exact question before us.

We also note that our denial of standing on zone of interest considerations is informed by prior decisional law of this Circuit. We have previously held "[i]n the absence of apparent congressional," or in this case constitutional, "intent to benefit," the putative plaintiff "there may still be standing if some factor—some indicator that the plaintiff is a peculiarly suitable challenger ...—supports an inference that Congress," or in this case the Framers of the Constitution, "would have intended eligibility." *Hazardous Waste Treatment Council v. United States EPA,* 861 F.2d 277, 283 (D.C.Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989). In the present case, we find no such factor.

In what is perhaps an excess of caution to be certain that we do not err in our application of the zone of interest test, we will examine plaintiffs' allegations as we previously did in *Cardenas v. Smith, supra.* There, in determining whether a litigant's "interest enjoys the protection of the [First] Amendment[ ]," we noted "that this inquiry tends to meld into the question of whether [plaintiffs] ha[ve] a cause of action to enforce" the Amendment. *Cardenas,* 733 F.2d at 915. In making this examination of the present plaintiffs' allegations, we note that where a lack of standing is based on our conclusion that the interests asserted fall outside the zone of interests protected by the relevant provi-

sion, as opposed to the case in which a lack of Article III standing implicates our constitutional jurisdiction, our disposition may be informed by an examination of the merits of the claim. For example, in *National Maritime Union of America v. Commander, Military Sealift Command,* 824 F.2d 1228 (D.C.Cir.1987), in which a union asserted standing to bring certain claims and justiciability of certain questions, we leaped to the merits because "[o]ur resolution of these issues [standing and justiciability], which do not implicate our constitutional jurisdiction or statutory jurisdiction ... would not be dispositive in any event, because even if the [plaintiff's] position on each of them is correct, we find that their ... claims fail on the merits." *Id.* at 1238. Similarly, in the present case, any lack of standing on zone of interest grounds, would be, as we noted above, a prudential decision and not one implicating our constitutional jurisdiction. Therefore, since we, as in *National Maritime Union,* find the claims to fail on their merits in any event, we will proceed, like that court, to consider the merits of plaintiffs' allegations.

In the present case we further determine to address the merits of the alleged claim,[6] because of the presence of DKT, a domestic organization, as a plaintiff. As we noted above, the complaint in this action does not clearly delineate between the First Amendment claims of the FNGOs and DKT. While the free speech claim in the complaint appears to be directed principally against interference with the alleged First Amendment rights of the FNGOs, at least in this Court, DKT argues that its free speech rights have been breached as well. While it is not clear whether the domestic plaintiff, as to whom AID certainly concedes the protection of the First Amendment asserts its first-party right to speak through its co-plaintiffs, or whether it asserts some sort of third-party standing, we need not explore the procedural niceties

---

**6.** We note that our discussion of the merits is not essential to our decision on standing. We address the merits at all only as we did in *Cardenas v. Smith,* because the two subjects are so intertwined in plaintiffs' arguments. We, of course, recognize as does the dissent that the question of "standing" is distinguishable from

"the question whether plaintiffs have a viable claim for relief." Dissent at 307, n. 10. We therefore intend not a "merits first" analysis as we conducted in *National Maritime Union,* but rather a "merits also" discussion, in which we may be properly accused of indulging in the inclusion of dicta.

any further since as we have already noted the free speech claim is without merit in any event.

█ In attempting to assert an infringement of free speech rights, plaintiffs constantly mischaracterize the policy of AID as a suppression of their viewpoint on abortion. What they actually complain of is not suppression, but rather a refusal to fund. The Supreme Court has "held in several contexts that a [government's] decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Regan v. Taxation With Representation*, 461 U.S. 540, 549, 103 S.Ct. 1997, 2003, 76 L.Ed.2d 129 (1983). For example, in *Regan*, the Court upheld a denial of tax deductible status to an apparently otherwise eligible nonprofit entity engaged in extensive lobbying activity. The Court recognized that lobbying is within the protection of the First Amendment and that "the government may not deny a benefit to a person because he exercises a constitutional right." *Id.* at 545, 103 S.Ct. at 2001 (citing *Perry v. Sinderman*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972)). But the Court further reasoned that "tax deductibility [is] a form of subsidy that is administered through the tax system." *Id.* at 544, 103 S.Ct. at 2000. Therefore, the Court concluded that the denial of deductibility was not within the *Sindermann* prohibition stating that "[t]his Court has never held that Congress must grant a benefit ... to a person who wishes to exercise a constitutional right." *Id.* at 545, 103 S.Ct. at 2001.

Similarly, in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Court upheld against constitutional attack a statutory scheme which provided funds for some but not all candidates for public office. Again, the activity in question, that is running for public office, is of a sort generally entitled to First Amendment protection. This did not mean that it was entitled to public subsidy. *Id.* at 93–108, 96 S.Ct. at 677.

In *Cammarano v. United States*, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), the Supreme Court upheld a denial of tax deductibility for sums expended by taxpayers in furtherance of political campaigns for the defeat of initiative measures pending before the voters in the taxpayers' states. That case occasioned a comment by Justice Douglas that

> To hold that this item of expense must be allowed as a deduction would be to give impetus to the view favored in some quarters that First Amendment rights must be protected by tax exemptions. But that proposition savors of the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State. Such a notion runs counter to our decisions....

*Id.* at 515, 79 S.Ct. at 534–35 (Douglas, J., concurring).

It is just that long-rejected notion that plaintiffs now assert as their free speech claim in the present case. Plaintiffs attempt to couch their claim in terms of the imposition of an "unconstitutional" condition on the receipt of a benefit, a practice forbidden in *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), and *Perry v. Sindermann, supra*. But the present case does not fit that mold. In *Speiser* the California Constitution denied any exemption from any tax imposed by the state or any county, city district, political subdivision, authority, board, bureau, commission, or public agency of the state to any "person or organization which advocate[d] the overthrow of the Government of the United States or the State by force or violence or other unlawful means or who advocate[d] the support of a foreign government against the United States in the event of hostilities...." Cal.Const. art. XX, § 19, quoted in *Speiser*, 357 U.S. at 516, 78 S.Ct. at 1336.

To effectuate that constitutional amendment, the California legislature adopted a statute requiring any taxpayer, in order to qualify for a tax exemption, to sign a statement on his tax return declaring that he did not engage in the activities set forth in the constitutional provision. While the Court assumed "without deciding that California may deny tax exemptions to persons

who engage in proscribed speech," *id.* at 519–20, 78 S.Ct. at 1338–39, the Court invalidated the statutory scheme, holding that "when the constitutional right to speak is sought to be deterred by a State's general taxing program due process demands that the speech be unencumbered until the State comes forward with sufficient proof to justify its inhibition." *Id.* at 528–29, 78 S.Ct. at 1343–44.

The *Speiser* case, therefore, while standing for the proposition that the First Amendment forbids the imposition of unconstitutional burdens on the claiming of a benefit, speaks not at all to an act of government which does nothing other than refuse to subsidize the exercise of a First Amendment activity. In *Speiser* there was no claim that the funds involved in the exemption were going to promote First Amendment activity, nor that the funds rendered exempt for other taxpayers not engaged in the First Amendment activity would be used for any other constitutionally protected purpose. The question of subsidy simply was not before the *Speiser* Court, nor does the *Speiser* decision speak to anything which informs our decision in the present case.

Neither does *Perry v. Sindermann* support plaintiffs' argument. In that case, an employee of a state college was denied tenure. The employee claimed that his denial of tenure was in retaliation for his exercise of his free speech rights, specifically, in publicly espousing positions unpopular with the Board of Regents. In holding that he had stated a claim for relief, the Court held that even where a person has no "right" to a government benefit, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry,* 408 U.S. at 597, 92 S.Ct. at 2697. The contrary rule, the Court observed, would allow the government to penalize and inhibit the exercise of First Amendment rights. Again, the present case is distinguishable. In the present case we have not a punishment for the exercise of a constitutional right, but at most a refusal to subsidize the exercise of free speech rights, and again,

for the reasons set forth above, the claim must fail.

Plaintiffs and their *amici* put forth other arguments designed to take their facts out of the general rule of *Cammarano* and *Regan* that a refusal to subsidize the exercise of their right is not an infringement of that right. First, they contend that the limitations in the present case are invalid because they constitute viewpoint-based discrimination. That is, they would have us strike the regulations because "AID ... continues to underwrite the association of domestic grantees with foreign affiliates hostile to abortion rights," but "prohibits domestic grantees from subgranting AID funds to foreign organizations that share [their] support of abortion rights." Brief for Amici Curiae Association for Voluntary Surgical Contraception, et al., at 19.

But the settled law is to the contrary. The fact that the government subsidizes one constitutionally protected or constitutionally permissible activity is no reason that it has to subsidize another. Here the government does not seek to punish the expression of a viewpoint, as in *Speiser,* but merely declines to subsidize one. In this respect, the present facts parallel those of *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). There the Court considered the regulation of the Connecticut Welfare Department limiting Medicaid benefits for abortion during the first trimester to those that were medically necessary, excluding from subsidy voluntary abortions, similar to the abortion-for-family-planning-purposes procedures excluded in the present case.

The District Court opinion under review there held that the exclusion constituted unconstitutional discrimination, reasoning that since *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), had established a constitutional right to abortion, the Connecticut program infringed the pregnant mother's constitutional right by "weight[ing] the choice of the pregnant mother against choosing to exercise her constitutionally protected right" and "thus infringe[d] upon a fundamental interest." *Roe v. Norton,* 408 F.Supp. 660, 663–64

(D.Conn.1975). The Supreme Court however, noted that "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Maher*, 432 U.S. at 475, 97 S.Ct. at 2383. The Supreme Court went on to hold that the state could fund childbirth while refusing to fund abortion since its refusal "place[d] no obstacles ... in the pregnant woman's path to an abortion." *Id.* at 474, 97 S.Ct. at 2382. Likewise, in the present case, the decision of the federal government to fund certain population planning activities does not require it to fund others, such as involuntary sterilization or abortion.

Here, again, the AID program has placed no obstacles in the way of the FNGO's or DKT's funding of abortions and abortion-related activity that were not there before the FAA funding ever began.

Other parallel authority is voluminous. For example, in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), the Court considered the constitutionality of the Hyde Amendment, Pub.L. No. 96–123, § 109, 93 Stat. 926, which limited the use of federal funds for nontherapeutic abortions. Relying in part on *Maher*, the Court again concluded that "the Hyde Amendment, like the Connecticut welfare provision at issue in *Maher*, represents simply a refusal to subsidize certain protected conduct. A refusal to fund protected activity, without more, cannot be equated with the imposition of 'penalty' on that activity." *Harris*, 448 U.S. at 317 n. 19, 100 S.Ct. at 2688 n. 19. *See also Webster v. Reproductive Health Servs.*, —— U.S. ——, 109 S.Ct. 3040, 3052, 106 L.Ed.2d 410 (1989). In *Norwood v. Harrison*, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), the Court similarly rejected an argument that the right to maintain private or parochial schools did not create the right to public funding of those schools, saying, "[i]t is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid." *Id.* at 462, 93 S.Ct. at

2809. *See also Planned Parenthood v. Arizona*, 718 F.2d 938 (9th Cir.1983).

Similarly, in the present case, the AID program places no obstacles in the way of those who would perform or promote abortions that were not there before the commencement of FAA funding. It, like the programs upheld in the cited Supreme Court cases, simply represents an election to fund some communicative and associational acts, while not funding all. Plaintiffs contend that this choice is an invalid one because the government has offered no compelling interest for its policy choice, but again this is not the law. The Supreme Court stated in *Maher v. Roe* that the state was "not required to show a compelling interest for its policy choice to favor normal childbirth," 432 U.S. at 477, 97 S.Ct. at 2385, and neither is the government in the present case. This simply represents a policy choice, not an invidious discrimination.

The government must make policy choices and constantly makes policy choices as to which human activities it will subsidize and which it will not. These are by definition viewpoint-based. That is, it subsidizes the activities consistent with the viewpoints of the persons who engage in those activities, and inconsistent with those who do not, and vice versa. Certainly some would say that the Surgeon General's activities against smoking discriminate against their personal viewpoints in favor of smoking. Never has a constitutional challenge to this program been sustained. *See generally Capital Broadcasting Co. v. Mitchell*, 333 F.Supp. 582 (D.D.C.1971), *aff'd*, 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972) (upholding ban on telecommunications cigarette advertising mandated by 15 U.S.C. § 1335, the same chapter which mandates Surgeon General warning against smoking). The same, as noted in the above-described cases, is true in the area of abortion.

If policy choices are made on philosophical and political viewpoint-based foundations in domestic affairs, how much truer must this be in the area of foreign policy. To hold that the United States government cannot make viewpoint-based choices in for-

eign affairs would be unthinkable. As the Supreme Court has frequently reminded us, "many [foreign affairs] questions uniquely demand single-voiced statement of the Government's views." *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962) (citing *Doe v. Braden*, 57 U.S. (16 How.) 635, 657, 14 L.Ed. 1090 (1854)).

To hold that the government cannot make viewpoint-based choices in foreign aid and foreign affairs would not only depart from settled precedent, but would work much mischief. While the examples are probably numberless, three will suffice. First, in light of the congressional finding that the "policy of apartheid is abhorrent and morally repugnant," 22 U.S.C. § 5020, it is altogether fitting and proper that the United States support policies "encouraging the government of South Africa to ... establish a timetable for the elimination of apartheid laws." 22 U.S.C. § 5011(b). It is unthinkable that in order to make this encouragement constitutional, the government would likewise have to underwrite efforts to encourage the continuance of the abhorrent and morally repugnant system of apartheid.

Likewise, chapter 43 of title 22 of the United States Code authorizes the Board for International Broadcasting "to make grants to RFE/RL, Incorporated [formerly Radio Free Europe and Radio Liberty], to carry out the purposes set forth in [22 U.S.C. § 2871]." 22 U.S.C. § 2873. The referenced purposes include the "promot[ion of] the right of freedom of opinion and expression, including the freedom 'to seek, receive, and impart information and ideas through any media and regardless of frontiers,' in accordance with article 19 of the Universal Declaration of Human Rights." 22 U.S.C. § 2871(1). Hardly anyone would assert that this title is unconstitutional unless it also requires the United States to make grants opposing the rights set forth in section 2871.

Perhaps the most telling example of the foreseeable serious results of such a holding lies very close to the hearts of plaintiffs. If the United States cannot constitu-

tionally fund international communication save on a viewpoint-neutral basis, then either the very population planning funding program in which plaintiffs seek to participate is constitutionally invalid, or, grants must be equally available to the significant number of domestic and foreign groups opposing population planning. In short, we have belabored this topic at least long enough, and conclude that a policy-based viewpoint discrimination in the making of grants to foreign nongovernmental organizations is not unconstitutional.

Plaintiffs finally argue that the limitations on the grants to the FNGOs should fall outside the rule of the denial of subsidy cases because: (1) the DNGOs are not permitted to subgrant funds to the FNGOs; and (2) the FNGOs, unlike foreign governments and DNGOs, are not left free to pursue their abortion-related goals with private funds while receiving government grants for other projects in segregated accounts. The first of these arguments, while perhaps a substantial one in favor of the DNGOs' right of association (*see* Section III(B)(1), *infra*) hardly bears mention in reference to the alleged free speech rights of the FNGOs. It would make little sense for the government to impose a policy-based limitation on the use of its grants, and yet permit a complete end-run around the limitation by granting the same funds to domestic entities who in turn subgrant them to the foreign recipients without imposing the same limitations. As the Supreme Court recognized in *Regan v. Taxation With Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), an indirect subsidy such as tax exemption is subject to the same constitutional analysis as a direct subsidy. As the Supreme Court elsewhere observed, "[t]he economic effect of direct and indirect assistance often is indistinguishable." *Grove City College v. Bell*, 465 U.S. 555, 565, 104 S.Ct. 1211, 1217, 79 L.Ed.2d 516 (1984). We can hardly compel the government to subsidize indirectly that which it has chosen not to subsidize directly.

The other objection is barely more substantial. When the government speaks in international affairs, it speaks not only

with its words and its funds, but also with its associations. It would certainly affect the foreign relations communications of the United States if it granted, for example, $200,000 to PSS and PSFP for distinct nonabortion projects the day before the same two FNGOs spent $200,000 to promote abortions. The Administration can hardly be faulted for assuming that this would mix the message of the Mexico City Policy. True, the Policy permits foreign governments, as opposed to NGOs, to continue to receive grants while funding abortion-related activities with their own funds, provided only that they use segregated accounts. *See* Policy Statement, *supra.* This recognition of the sovereignty and self-determination rights of other states, consistent with the congressionally declared policy of 22 U.S.C. § 2151b(a), hardly compels a public association between the United States government and private foreign organizations pursuing goals at odds with those of United States foreign policy.

██ Neither does the difference in treatment in FNGOs, such as PSS and PSFP on the one hand, and DNGOs, such as DKT on the other, compel the United States to change its policy to treat the foreign entities as it would domestic ones. A recognition of a right, whether or not constitutionally based, for American entities to pursue certain goals with their own funds while receiving largess from the government for other pursuits does not in any way mandate that the same treatment must be afforded foreign entities. We observe again, that a nation speaks in foreign affairs not only by the express messages that it sends, but by its choice of foreign entities with whom it will associate. Plaintiffs have shown us no basis upon which we may dictate that choice to the political branches, in this case the Executive, on this particular matter of foreign affairs, an area in which, as we already noted, the Executive receives *its* greatest deference, and in which we must recognize the necessity for the nation to speak with a single voice. *See Palestine Information Office,* 853 F.2d at 937; *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. at 706.

Although *amici* for plaintiffs assert that the means employed to achieve the policy goals are invalid because they are not the "least restrictive," this avails them nothing. Though they cite the use of segregated accounts in the funding of foreign governments and DNGOs as a less restrictive method, that is essentially irrelevant to the immediate question. As *Harris v. McRae* teaches, this sort of viewpoint-based subsidization decision is not "predicated on a suspect classification," and is subject only to a rational relationship test not the sort of strict scrutiny that may require use of the least restrictive means. 448 U.S. at 323, 100 S.Ct. at 2691. *Accord Maher v. Roe,* 432 U.S. at 469–74, 97 S.Ct. at 2380–83.

In sum, we find that the FNGOs do not enjoy standing to assert the constitutional claims under any application of the zone of interest analysis.

**B.** *DKT's Freedom of Association Claims*

**1. AID Restrictions on Subgrants**

██ In addition to the claims asserted that AID's implementation of the Mexico City Policy infringes the supposed constitutional rights of the FNGOs, the DNGO DKT Memorial, asserts that the Policy and the implementing grant clauses unconstitutionally burden its rights to freedom of association. Its argument is twofold. First, DKT asserts that the provision forbidding subgrants by domestic grant recipients to FNGOs who are ineligible to receive grants directly interferes with the domestic recipient's right to associate with FNGOs of its choice in nonabortion-related projects. The concrete factual setting for the assertion of this claim arises from the project in Uttar Pradesh, India, described in the amended complaint. All parties agree for purposes of the present litigation that the project would be eligible for subgrant funds, but for the unwillingness of the FNGOs to comply with AID's abortion-related restrictions. DKT asserts that but for the grant clauses, it would be free to associate with the nonconforming FNGOs in the Uttar Pradesh project and asserts

that the clauses therefore impermissibly infringe its freedom of association. AID's response is a simple one. AID essentially says "DKT is just as free to associate with the FNGO's as they ever were. They just can't do it on our money."

Factually, AID is obviously correct. And, we conclude, AID is legally correct as well. By way of background to this conclusion, we note that freedom of association, while not expressly mentioned in the Constitution, is protected as a First Amendment right, under the Supreme Court's decision in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). In that decision, which struck down an Alabama statute requiring disclosure of membership lists of the petitioning association, the Supreme Court recognized "that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the due process clause of the Fourteenth Amendment, which embraces freedom of speech." *Id.* at 460, 78 S.Ct. at 1171. In succeeding cases, the Supreme Court has found "constitutionally protected 'freedom of association' in two distinct senses." *Roberts v. United States Jaycees*, 468 U.S. 609, 617, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). One line of cases secures the individual freedom to "enter into and maintain certain intimate relationships," *id.*, principally marriage and the family. *See generally id.* at 618–20, 104 S.Ct. at 3249–50. The second, and the one with which we are concerned in the present case, recognizes "a right to associate for the purpose of engaging in ... activities protected by the First Amendment," *id.* at 618, 104 S.Ct. at 3249, including speech.

The Supreme Court has recognized the constitutional protection of the right of expressive association in varied contexts, *see* cases collected in *Roberts v. United States Jaycees*, 468 U.S. at 618–21, 104 S.Ct. at 3249–51, but plaintiffs have offered no case in which the Court has extended this protection to the decision of two or three organizations to "associate" together for the conduct of an undertaking, such as the Uttar Pradesh population planning project,

involving much conduct and some expression. Nor have we found any such case. Perhaps the closest example in prior Supreme Court law to the facts at hand is *Lyng v. International Union, UAW*, 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988), in which labor unions and their members asserted the rights of the members to associate together for the purpose of conducting a strike. The Court recognized that the right to association "encompasses the combination of individual workers together in order better to assert their lawful rights." *Id.* at ——, 108 S.Ct. at 1189.

That case was certainly stronger for the union members than is the present case for the three NGOs. In that case the purpose of the particular project for which the unions and their members sought protection of associative rights was directly to exercise freedom of expression. In the present case, DKT does not assert that the project at Uttar Pradesh is to exercise freedom of speech *per se*, but rather that their associative rights in this project be protected because of their expression elsewhere. Again we know of no case that goes so far, and we are unwilling to hold on the present record that the constitutional protection of the right to associate is so extended. However, since we will conclude that even if the right does so extend, the policy and the grant clauses work no infringement of the right, we will assume for purposes of this opinion that the combination of the NGOs in the Uttar Pradesh project is entitled to freedom of association protection.

Our conclusion that the policy and the grant clauses work no infringement of the assumed right of association is based on precisely the factual assertion made by DKT. The restriction on subgranting creates no obstacle in the way of DKT's association with the FNGOs that would not be there absent the existence of the grant program in the first place. The only thing that presently prevents DKT and the FNGOs from associating in the Uttar Pradesh project is the unwillingness or inability of DKT and its prospective partners to fund the project. If they become willing or

able to fund the project with their own money, or money granted by some source other than United States foreign aid funds, then they can undertake the project immediately. Neither AID nor any other arm of the federal government has erected the obstacle of impecunity or parsimony, they have simply declined to clear that obstacle out of the NGOs' way.

Just as the Supreme Court in *Maher v. Roe, supra,* concluded that the Connecticut regulations against funding nontherapeutic abortions did not interfere with the rights recognized in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), neither does the present policy or its implementation interfere with the right of association. In that case, as we noted above, the regulation placed no obstacle "in the pregnant woman's path," *Maher,* 432 U.S. at 474, 97 S.Ct. at 2382, but only left her as dependent as before on private sources for the service she desired. Similarly, in the present case, the decision of the government not to fund the association of DNGOs with FNGOs who engage in pro-abortion activity only leaves the DNGOs as dependent on private source funds as they were before.

As we also noted above, not only *Maher v. Roe,* but a whole line of Supreme Court cases teaches us that the refusal to subsidize the exercise of a constitutionally protected right is not tanamount to an infringement of that right. *See, e.g., Regan v. Taxation With Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); and *Cammarano v. United States,* 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959). Perhaps particularly instructive is language from *Buckley.* That case considered the constitutionality of public financing under the Federal Election Campaign Act of 1971, 86 Stat. 3, as amended by the Federal Election Campaign Act Amendments of 1974, 88 Stat. 1263. As we noted above, that Act provided financial subsidies for some but not all candidates for certain offices. In upholding the constitutionality of this differentiation in subsidy, the Court rejected an analogy to such cases as *American Party of Texas v.*

*White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), which had stricken down burdensome restrictions on obtaining places on ballots. In rejecting that analogy, the Court reasoned that the funding law

> does not prevent any candidate from getting on the ballot or any voter from casting a vote for the candidate of his choice; the inability, if any, of minor-party candidates to wage effective campaigns will derive not from lack of public funding but from their inability to raise private contributions.

*Buckley,* 424 U.S. at 94–95, 96 S.Ct. at 670–71.

As the Supreme Court observed in *Maher v. Roe,* "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consummate with legislative policy." 432 U.S. at 475, 97 S.Ct. at 2383. Without reiterating the discussion of the various cases distinguishing between interference with the exercise of a right and the refusal to subsidize it, we conclude that the decision of the Executive not to fund certain associations by subgrant as well as by grant infringes no right of the DNGO desiring to join in the unsubsidized association.

We are given confidence in the conclusion by the Supreme Court's decision in *Lyng v. International Union, UAW, supra.* In that case, strikers challenged on freedom of association grounds the constitutionality of a statute restricting the eligibility of households containing strikers to obtain food stamps. The statute not only prohibited such households from qualifying for allotment of food stamps but placed them in a less favorable status than families containing members who voluntarily quit jobs. The households containing strikers were ineligible for the duration of the strike, no matter how long, whereas voluntary quitters regained eligibility after ninety days. Even in light of this asserted discrimination, the Court subjected the statute only to a rationality analysis, and concluded that this refusal to subsidize was valid since it was "rationally related to the

stated objective of maintaining neutrality in private labor disputes." 485 U.S. at ——, 108 S.Ct. at 1193. As we concluded above, the decision of the Executive to fund some but not all population planning activity is not an invidious discrimination. The decision not to indirectly fund the same activity which the government has declined to fund directly is obviously rationally and perhaps necessarily related to the decision not to fund the activity in the first place, *cf. Grove City College v. Bell, supra* (upholding restrictions on aid to education by giving the same effect to indirect aid to college through federally insured loans to students as to direct aid). We will no more invade the province of the executive branch to make its policy determinations as to subsidization on DKT's attack on limitations of indirect aid than on the FNGOs' attack on direct aid.

### 2. AID Restrictions on Direct Grants to FNGOs

The other argument that DKT's associational rights are infringed, is advanced more vigorously by *amici* American Civil Liberties Union, et al., than by DKT itself. That argument is that the AID restriction on grants to any FNGO that "performs or actively promotes abortion as a method of family planning" infringes DKT's right to associate with FNGOs on abortion-related projects. *Amici* argue that "[t]he Clause cripples DKT in its efforts to initiate, *with its own funds,* international cooperative projects to preserve or advance abortion rights," because the grant clause forbidding foreign grant recipients from receiving AID funds if they participate in abortion promotion even with non-AID funds buys off DKT's potential partners in international association to promote abortion for family planning purposes. Brief of Amici Association for Voluntary Surgical Contraception, et al., at 10. This argument asserts that rather than lose AID funding for their nonabortion projects, DKT's fair-weather foreign associates will withdraw from or decline to participate in abortion-related projects with DKT.

Whether this restriction and the alleged infringement of DKT's associational rights

are constitutionally impermissible raises problematic constitutional questions. First, before this Court are only organizations asserting that restrictions applied to them qua organizations infringe the right of the organizations to associate together. Neither this Court nor the Supreme Court has held that the Constitution protects rights of association between two organizations. *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), both find a "constitutionally protected 'freedom of association.'" *Id.* at 617, 104 S.Ct. at 3249. Both cases also recognize the right of individuals to associate in groups to exercise constitutional freedoms. *NAACP,* 357 U.S. at 460–63, 78 S.Ct. at 1170–72; *Roberts,* 468 U.S. at 622, 104 S.Ct. at 3251. Nevertheless, we know of no case, and plaintiffs have not drawn our attention to any case, protecting associational relationships exclusively between organizational entities. Indeed, although NAACP allowed the NAACP to assert the rights of its members, the Supreme Court specifically addressed only the right of the members to associate and not the right of the organization itself. *NAACP,* 357 U.S. at 458–59, 78 S.Ct. at 1169–70. Similarly *Roberts* examined the *"members'* freedom of intimate association and [the *members'*] freedom of expressive association." *Roberts,* 468 U.S. at 618, 104 S.Ct. at 3250 (emphasis added). Likewise, *Board of Directors of Rotary Int'l v. Rotary Club,* 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1988), considered the effect of a state statute prohibiting gender discrimination on *individuals'* freedom of association even though the club was a party. *Id.* at 544–45, 107 S.Ct. at 1945.

*Lyng v. Int'l Union, UAW,* 485 U.S. 360, ——, 108 S.Ct. 1184, 1189, 99 L.Ed.2d 380 (1988), refers to the "associational right of appellee individuals and their unions," thus offering some support for a recognition of organizational rights of association. However, *Lyng* does not extend to the right of one organizational entity to associate with another organizational entity. Like the

preceding cases, *Lyng* focused on the impairment of *individuals'* ability to join together.

Second, DKT asserts its right to associate with foreign organizations. Although the right of Americans to maintain First Amendment relationships with foreigners has been upheld in *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (allowing U.S. citizen to receive, without interference, mail from foreign communist organizations), the right of Americans to associate with nonresident aliens "is not an absolute." *Palestine Information Office v. Shultz*, 853 F.2d 932, 941 (D.C.Cir.1988).

In *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), using logic parallel to *amici*'s here, a group of American professors argued that the Attorney General's failure to allow a foreign Marxist to speak at their invitation deprived the Americans of their First Amendment rights. The Supreme Court permitted the exclusion of Mr. Mandel over this constitutional objection. Because of Congress's plenary power to regulate admissions to the United States, the Supreme Court did not require that the government's interest in exclusion be balanced against the First Amendment infringement. *Id.* at 770, 92 S.Ct. at 2585. In *Shultz*, however, presented with important interests, but not plenary power, this Court held that "we must weigh [the interests of U.S. citizens in associations with foreigners] against those of the government." *Palestine Information Office v. Shultz*, 853 F.2d at 941.

AID asserts that our decision on the present case should be informed by the Supreme Court decision in *Lyng*. There the Supreme Court noted that the statute restricting food stamp eligibility of households containing striking union members did in fact interfere with the striker's right to associate either with his family or his union for expressive purposes, both of which are protected exercises of the right of association. Nonetheless, the Supreme Court held that the statute was not unconstitutional because it did not " 'directly and substantially interfere' " with the exercise of the associational rights. *Id.* 485 U.S. at ——, 108 S.Ct. at 1189 (quoting *Lyng v. Castillo*, 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986)). The Court further observed that the statute did "not 'order' appellees not to associate together for the purpose of conducting a strike, or for any other purpose, and it does not 'prevent' them from associating together or burden their ability to do so in any significant manner." *Id.* 485 U.S. at ——, 108 S.Ct. at 1189–90. Thus, the Supreme Court held the statute constitutional while acknowledging that "the Government's refusal to extend food stamp benefits to those on strike" undeniably "makes it harder for strikers to maintain themselves and their families during the strike and exerts pressure on them to abandon their union." *Id.*

Here, too, AID argues the challenged clauses may "make it harder" for DKT to find partners for its international abortion promotion ventures, but it does not prevent any association, nor does it order anyone not to associate with anyone else.

Also supportive of AID's position is *Grove City College v. Bell, supra.* In that case the Supreme Court upheld the constitutionality of the application of certain limitations on federal aid to education in a context somewhat analogous to that posed by *amici* on behalf of DKT. In that case the Court was construing a limitation imposed by section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). Regulations promulgated under that section forbade aid to educational programs which did not execute an "Assurance of Compliance" required by 34 C.F.R. § 106.4 (1983). Grove City College did not discriminate, did not receive any direct federal aid, but on religious and other First Amendment protected grounds declined to enter into compacts with the government and refused to execute the Assurance of Compliance. Although Grove City College received no direct federal aid, 140 of its students received federal grants and 342 obtained guaranteed student loans. In the face of First Amendment challenges from Grove City College and some of its students, the Supreme Court held that Con-

gress could "attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obligated to accept." *Grove City College*, 465 U.S. at 575, 104 S.Ct. at 1222. The Supreme Court further stated "[s]tudents affected by the Department's action may either take their [grant money] elsewhere or attend Grove City College without federal financial assistance." *Id.*

The present allegations cast DKT in the role of Grove City and the allegedly bought-off FNGOs in the role of the grant-receiving students. The hypothetical FNGOs may forgo the federal aid and associate with DKT in abortion programs or they may take the grants and their association elsewhere. The dissent would distinguish the present case from *Grove City* by mischaracterizing the *Grove City* decision. My colleague asserts that "abortion (or anti-abortion) counseling is constitutionally sheltered speech ... while discriminating adversely on the basis of race, national origin, religion or sex is not one's constitutional right." Dissent at 301, n. 2 (citations omitted). However, in *Grove City* "[t]he undisputed fact is that Grove City does not discriminate—and so far as the record in this case shows—never has discriminated against anyone on account of sex, race, or national origin. This case has nothing whatever to do with discrimination past or present." *Grove City College v. Bell*, 465 U.S. at 577, 104 S.Ct. at 1223 (Powell, J., concurring). Section V of the majority opinion in *Grove City*, 465 U.S. at 575–76, 104 S.Ct. at 1222, from which we quoted in the last preceding paragraph and in which the Supreme Court rejected the First Amendment claim of Grove City and its students, neither cited *Bob Jones University v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), nor accused Grove City of discrimination.

■ In any event, on the present record we need not decide between the arguments of DKT, their *amici*, and the dissent, on

the one hand and AID on the other with respect to this point. Indeed, we must not so decide, for we have no jurisdiction. The doctrine underlying our lack of jurisdiction is pointedly demonstrated by *amici*'s argument. They seek to illuminate the effect of the challenged clauses, not with facts but with a hypothetical example concerning a United States agency bribing foreigners not to attend a political speech by an American politician travelling abroad. Brief for Amici Curiae Association for Voluntary Surgical Contraception, et al., at 10 n. 14. We, of course, can do nothing for the fictitious American or her audience, since that is but a hypothetical case. The greater problem is that the case of the fleeing FNGOs is just as hypothetical as the *amici*'s example. So far as the record establishes, neither of these cases has ever happened yet. We are barred from determining the issues presented in either of these hypotheticals by the absence of a claim ripe for adjudication.[7] While the ripeness doctrine has a prudential branch, *see, e.g., Better Government Ass'n v. Department of State*, 780 F.2d 86 (D.C.Cir.1986), a lack of ripeness arising from the fact that no concrete injury has yet occurred is jurisdictional. As the Supreme Court has often told us, " 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.' " *Laird v. Tatum*, 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972) (quoting *United Public Workers v. Mitchell*, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947)). An advisory opinion is what plaintiffs seek in the present case on this issue. After cross-motions for summary judgment, an appeal with a remand and an opportunity to amend the complaint, and another round of cross-motions for summary judgment, DKT has yet to point to the first grant-receiving FNGO who would be associating with it but for the limitations in the challenged grant clauses. The amended complaint offered allegations sufficient to give DKT

---

7. In fairness to plaintiffs we again note that *amici* assert this unripe claim at much greater volume than plaintiffs themselves. Perhaps the force of assertion by groups dedicated to the general pursuit of First Amendment goals, as

opposed to the concrete plaintiffs who came to court principally to assert their individual claims serves to further illustrate the unripeness of the present controversy.

standing to assert its objections to the sub-grant restrictions. However, as to the claim that the restrictions on direct grants to FNGOs infringe DKT's rights, DKT does not allege that PSS or PSFP has broken off association or that they will break off association with DKT. Indeed, appellant's complaint specifies that none of the appellant NGOs will cease performing abortions. Consequently, the only harm even inferable from the facts alleged is to the FNGOs who would forgo funding rather than cease their abortion-related activities and associations. As we have stated earlier, the FNGOs are without standing to assert this claim and DKT, without any injury to itself, is likewise without standing to assert the rights of the FNGOs. *See Craig v. Boren,* 429 U.S. 190, 193–94, 97 S.Ct. 451, 454–55, 50 L.Ed.2d 397 (1976) (plaintiff permitted to assert *jus tertii* standing because she suffered injury in fact); *Secretary of State v. J.H. Munson Co.,* 467 U.S. 947, 958, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984) (in order to bring any claim, including one *jus tertii,* party must sustain injury in fact).

DKT does not allege that any individual or organization has refrained from associating with it. Nor does DKT allege the existence of any particular organization that is likely to break off association. At most, plaintiffs and *amici* have asserted in briefs that this consequence is possible. Such a claim is the substance of law school exams, not of "cases and controversies." Indeed, the only FNGOs ever named by DKT are its co-plaintiffs who, according to the full record, neither accept grants nor curtail their association with DKT. In this regard DKT and its co-plaintiffs rather closely resemble the respondents in *Laird v. Tatum,* who had complained in district court of the "chilling effect upon the exercise of their First Amendment rights" of intelligence-gathering programs of the Department of Defense. In rejecting their claim, the Supreme Court concluded that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm...." *Laird,* 408 U.S. at 13–14, 92 S.Ct. at 2325–26. In so doing,

the Supreme Court noted in the margin that "respondents ... were 'not people, obviously, who are cowed, and chilled' " but "were quite willing 'to open themselves up to public investigation and public scrutiny.' " Thus, the Court concluded, "[e]ven assuming a justiciable controversy, if respondents themselves are not chilled, but seek only to represent those ... whom they believe are so chilled, respondents clearly lack that 'personal stake in the outcome of the controversy' essential to standing." *Id.* at 13–14, n. 7, 92 S.Ct. at 2326, n. 7 (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). Ripeness, like standing, serves "the central perception ... that courts should not render decisions absent a genuine need to resolve a real dispute." 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3532.1 (1984), and authorities collected therein.

Here it is not only the application of the grant clause but also the response of unidentified third parties to that clause that is in question. "If the injury be a future one the occurrence of the injury must be reasonably certain and clearly describable for the action to be deemed 'ripe' for adjudication." *Martin Tractor Co. v. Federal Election Comm'n,* 627 F.2d 375, 379 (D.C. Cir.), *cert. denied sub nom. National Chamber Alliance for Politics v. Federal Election Comm'n,* 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980). *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 81, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978), teaches that the constitutional requirement for ripeness is injury in fact. Likewise, *Martin Tractor Co.* states that "[r]ipeness enters the Article III 'case or controversy' picture in the determination whether the requisite injury is in sharp enough focus and the adverseness of the parties concrete enough to permit a court to decide a real controversy and not a set of hypothetical possibilities." 627 F.2d at 379.

After rejection of its claim by the District Court on the first summary judgment motions, an opportunity to amend, and remand, with respect to the buy-off argu-

ment DKT still comes before us with a bare allegation of "subjective chill" of unnamed FNGOs. We look to the record in the context of a summary judgment motion, where the "party [must] go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)). On the present record, after more than ample opportunity, plaintiff can point to nothing demonstrating even the remotest evidence of a controversy ripe for review on this issue. Therefore, we conclude, that summary judgment should have been entered dismissing plaintiffs' constitutional attack on the AID grant clause denying FAA funds to FNGOs unwilling to forgo abortion-related activity during the term of the grant.

The dissent would reject our ripeness analysis in part with the accusation that we have "lowered the boom" on plaintiffs without giving them proper notice and opportunity to be heard. Dissent at 302 n. 3. To this we would offer brief response. The buying-off claim which we find unripe was not articulated by plaintiffs in their complaint. Neither did plaintiffs raise it in their prior appeal to this Court. Nor did plaintiffs assert it in the papers accompanying the cross-motions for summary judgment. Nor did they assert it in their principal brief in this Court. It was only when this argument was raised by *amici* that plaintiffs adopted it as their own. Underscoring the lack of record support for the buying-off argument is the fact that our dissenting colleague finds concreteness (or "documentation of reality" to paraphrase the dissent) not in any affidavit or other accompanying evidence from the District Court proceeding, but from the presence of "population amici" who joined in briefing to this Court. Dissent at 300, n. 1. Therefore, while we grant that we would rather not dispense with an alleged claim by dismissal on ripeness grounds at the eleventh hour, when the argument is not made until the tenth hour plus fifty-nine minutes, we can dispense with it no sooner.

We would further remind our colleague that courts have the duty to examine ripeness when the case presents the problem, even when the parties do not wish it addressed.

> [T]o the extent that questions of ripeness involve the exercise of judicial restraint from unnecessary decision of constitutional issues, the Court must determine whether to exercise that restraint and cannot be bound by the wishes of the parties.

*Regional Rail Reorganization Act Cases*, 419 U.S. 102, 138, 95 S.Ct. 335, 356, 42 L.Ed.2d 320 (1974) (footnote omitted).

Since this is such a case, we cannot avoid the ripeness question. As we have previously held "[t]he question of ripeness goes to our subject matter jurisdiction, and thus we can raise the issue *sua sponte* at any time." *Duke City Lumber Co. v. Butz*, 539 F.2d 220, 221 n. 2 (D.C.Cir.1976).

Finally, we perceive that we have inflicted no unfairness on plaintiffs. In our prior review of this case, we did indeed, as the dissent points out, remand the matter for further consideration on the issue of standing. *DKT Memorial Fund, Ltd.*, 810 F.2d at 1239. Ripeness and standing involve the same considerations of currently redressable injury. "[R]ipeness ..., indeed, could be seen as providing time-bound perspective[ ] on the injury inquiry of standing." 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, § 3531 at 350 (1984). Otherwise put: "standing and ripeness theories often merge so closely that there is no reason to attempt separation." 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, § 3532.1 at 131 (1984) (citing, *inter alia, Pence v. Andrus*, 586 F.2d 733, 736–39 (9th Cir. 1978) ("Standing and ripeness are similar in that both doctrines prevent courts from becoming enmeshed in abstract questions which have not concretely affected the parties.")). In the present case, this enmeshing of ripeness and standing doctrines is well illustrated. The attempt to substitute "subjective 'chill'" for "claim of specific

present objective harm or threat of future harm" caused the District Court initially to determine that plaintiffs lacked standing. *DKT Memorial Fund*, 630 F.Supp. at 242 (citing *Laird v. Tatum*, 408 U.S. at 13–14, 92 S.Ct. at 2325–26). The same inadequacy of the attempted substitution, even after the amendment of the complaint, necessarily dooms the belatedly asserted buying-off claim on ripeness grounds. Indeed, *Laird v. Tatum* is not at pains to distinguish between standing on the one hand and ripeness on the other. Rather, it requires, by whatever doctrinal appellation, "specific present objective harm or a threat of specific future harm," *Laird v. Tatum*, 408 U.S. at 14, 92 S.Ct. at 2326, as opposed to "[a]llegations of a subjective 'chill.'" *Id.* at 13, 92 S.Ct. at 2325–26. Plaintiffs were on quite adequate notice long ago of the need for such specific present harm and have demonstrated none.

IV. SUMMARY AND CONCLUSION

To recapitulate briefly, after reviewing the record, the arguments of all parties, and the applicable law, we conclude that: (1) the District Court did not err in finding that the statutory arguments of all plaintiffs were unmeritorious, and we affirm the District Court's judgment to the extent that it upheld the challenged grant clauses against statutory attack; (2) Parivar Seva Sanstha and Population Services Family Planning Ltd. lack standing to assert invalidity of the grant clauses under the Constitution of the United States, and we therefore affirm the decision of the District Court in that regard and the order of the court dismissing their claims; (3) the District Court did err in concluding that the challenged clauses restricting subgrants violated the right of DKT to associate with PSS and PSFP, and we reverse the District Court's order allowing relief on that basis; and (4) DKT has presented no claim ripe for adjudication that the clauses governing grants to unnamed foreign nongovernmental organizations unconstitutionally interfere with DKT's right to associate with them, and we remand the case for dismissal of that claim. In short, the decision of the court below is affirmed in part, re-

versed in part, and the case is remanded with instructions that it be dismissed.

RUTH BADER GINSBURG, Circuit Judge, concurring in part and dissenting in part:

Based on the wide discretion Congress accorded the President to furnish assistance for voluntary population planning abroad "on such terms and conditions as he may determine," 22 U.S.C. § 2151b(b) (1982), I concur in the court's disposition of plaintiffs' statutory claims. I dissent, however, from my colleagues' rulings on the constitutional aspects of this case. In accord with the district court, I conclude that the Agency for International Development (AID) has unconstitutionally deployed its puissant purse to restrain the privately-funded speech and association of domestic nongovernmental organizations (NGOs) engaged in family planning work overseas, NGOs here exemplified by plaintiff DKT Memorial Fund, Ltd. (DKT). Because AID respect for the first amendment rights of domestic grantees should assure the relief all plaintiffs seek, I would pretermit the question whether our government officers have overstepped constitutional limitations on their authority with respect to foreign NGOs, here exemplified by plaintiffs Parivar Seva Sanstha (PSS), an Indian nonprofit society, and Population Services Family Planning Programmes, Ltd. (PSE, for Population Services Europe), a United Kingdom charity.

I.

The situation stateside is not in dispute. On the one hand, government need not spend public funds on abortion services; it may, instead, encourage the indigent pregnant woman to reproduce by paying the full medical costs of childbirth, *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), as well as child support thereafter. On the other hand, government may not deter private action; it may not deny public funding available for non-abortion related family planning to otherwise qualified domestic organizations that

use their privately-raised funds for lawful abortion-related services. *Planned Parenthood v. Arizona*, 789 F.2d 1348 (9th Cir.), *aff'd mem. sub nom. Babbitt v. Planned Parenthood Fed'n*, 479 U.S. 925, 107 S.Ct. 391, 93 L.Ed.2d 346 (1986). Government may demand only that public funds be segregated by the grantee so that they are used solely for the specified family planning services, and not for abortion-related activity.

The same arrangement is effective when foreign nations themselves seek family planning assistance. If those nations "support abortion with funds not provided by the United States government," they nonetheless qualify as grantees; "the United States will contribute to such nations [for family planning programs] through segregated accounts which cannot be used for abortion." Policy Statement of the United States of America at the United Nations International Conference on Population (Second Session) Mexico, August 6–13, 1984, at 4–5 [Mexico City Policy Statement]. Domestic NGOs, as well, qualify for family planning grants for programs abroad, so long as they hold federal funds separate from any funds they raise and use for abortion-related services. *See* Brief for Appellees–Cross–Appellants at 9. These accommodations too, like the stateside situation, are not at issue in this case.

Addressing foreign NGOs, however, our government speaks in a different, dissonant voice. For those organizations, there is no accommodation, no tolerance for what the organization would elect to do with other resources available to it, whether from private donations or contributions by foreign governments. To receive AID funds, either indirectly as subgrantee of a domestic NGO or directly as grantee, the foreign NGO must agree in writing "that it will not, while receiving assistance under th[e] grant, perform or actively promote abortion as a method of family planning in A.I.D.-recipient countries or provide financial support to other foreign nongovernmental organizations that conduct such activities." AID Handbook 13 (Grants), effective June 19, 1987, at 4C–49 (Ineligibility of Foreign Nongovernment Organizations That Perform or Actively Promote Abortion as a Method of Family Planning) (governing subgrantees); *see id.* at 4C–48 (agreement by subgranting domestic NGO); *id.* at 4D–54, effective Jan. 1, 1987 (certification by foreign NGO as direct grantee). It is not enough that the foreign NGO, in common with the nation it serves, agree that no grant funds will be used to cover abortion-related expenditures; the condition is that the foreign NGO will not venture into the abortion service, counseling, or referral area at all. That condition, covering the foreign NGO's allocation of funds supplied by donors other than the United States, is the one—the only one—contested in this litigation.

There is no pretense on AID's part, however, that the policy in question affects only foreign NGOs. The policy impacts powerfully on domestic NGOs like plaintiff DKT that use their own private resources to enable poor women, at home and abroad, to gain access to abortion services. The AID condition effectively picks off or buys up the audience or associates abroad that organizations like DKT must have if they are to act in the international arena.[1] In so

**1.** This reality is documented by the eleven "population amici" who joined in a brief to this court: the Association for Voluntary Surgical Contraception; the Centre for Development and Population Activities; the Center for Population and Family Health; Family Health International; Alan Guttmacher Institute; International Projects Assistance Services; International Women's Health Coalition; the Pathfinder Fund; the Population Council; the Population Crisis Committee; Planned Parenthood Federation of America. These domestic NGOs reported finding that AID's extraordinary condition on grants and subgrants to foreign NGOs blocked the domestic NGOs "from associating, for purposes of speech relating to abortion, with many of the most logical and effective potential foreign partners in such speech." Brief of Amici Curiae at i, viii.

The Center for Population and Family Health (CPFH), for example, is a "research center of Columbia University that conducts research, training and policy work on population issues in developing countries, especially in Africa." *Id.* at ii. CPFH states that AID's restraint on foreign NGOs "has ... meant that private groups in Africa that might work with CPFH, using private funds, on expanding abortion rights have been unwilling to do so because it

doing, the condition runs afoul of constitutional limitations. As government counsel candidly acknowledged at oral argument, AID informs the foreign NGO: "If you are going to work on [a family planning] project with U.S. dollars, then you must agree to shun DKT to the extent that DKT seeks an alliance with you to provide abortion counseling." A condition thus designed to entice away DKT's audience and allies is unconstitutional. *See generally Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Sullivan, *Unconstitutional Conditions,* 102 Harv.L.Rev. 1413 (1989).[2]

The district court spoke concretely with reference to the instant case. DKT currently ventures jointly with foreign NGOs like PSE and PSS to provide birth control

information and services to impoverished women abroad. Using non-AID funds, these organizations cooperate in the provision of information about, and access to, abortion. The current AID restrictions, however,

> impair the associational rights of DKT. In order to qualify for AID funding, PSE and PSS would be required to terminate [the] non-AID funded abortion programs in which DKT participates, thereby preventing DKT from implementing those programs in association with PSE and PSS.

*DKT Memorial Fund Ltd. v. AID,* 691 F.Supp. 394, 405 (D.D.C.1988). Even if PSE and PSS resist the attraction of the U.S. dollars, and the good work one can accomplish with those funds, it is hardly a matter for "speculation" that other foreign NGOs will steer clear of DKT's privately-funded abortion counseling to avoid jeopardizing AID eligibility. *See supra* note 1.[3]

will disqualify them from receiving AID funding." *Id.* at iii. The Population Council relates: "A privately funded Council project on septic and incomplete abortions has been stymied because of concern by the prospective foreign NGO partner that participating might jeopardize its AID eligibility." *Id.* at vi.

These clear statements by major domestic NGOs refer to actual, not hypothetical, situations. The court, in short, is dead wrong in asserting that amici are organizations in the main primarily "dedicated to the general pursuit of First Amendment goals" rather than to family planning. Court's Opinion at 296 n. 7. My brethren err as conspicuously in pretending that "[a]t most, plaintiffs and amici" posit "the fleeing FNGOs" only hypothetically. *See* Court's Opinion at 296–97.

**2.** *See also infra* note 6.

The court lapses again when it equates this case not to *Sherbert v. Verner* or *Shapiro v. Thompson,* but to *Grove City College v. Bell,* 465 U.S. 555, 575, 104 S.Ct. 1211, 1222, 79 L.Ed.2d 516 (1984). *See* Court's Opinion at 295–296. The petitioner in that case, Grove City College, resisted compliance with a federal law, Title IX of the Education Amendments of 1972, prohibiting sex discrimination in any education program or activity receiving federal assistance. As a last ditch argument, the college asserted that "conditioning federal assistance on compliance with Title IX infringes First Amendment rights of the College and its students." *Grove*

*City College,* 465 U.S. at 575, 104 S.Ct. at 1222. The Supreme Court swiftly rejected the plea. *Id.* at 575–76, 104 S.Ct. at 1222–23. DKT matches Grove City College, my colleagues say, and the foreign NGOs match the students. Court's Opinion at 296. These are mismatches, for abortion (or anti-abortion) counseling is speech sheltered by the first amendment, *see Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), while discriminating adversely on the basis of race, national origin, religion or sex is not one's constitutional right. As our sister court observed in the *Grove City College* litigation:

> [T]he first amendment does not provide private individuals or institutions the right to engage in discrimination. Thus, neither Grove nor its students can assert an alleged first amendment right to be free of the strictures of Title IX's prohibitions of gender discrimination and also claim the right to continued federal funding.

*Grove City College v. Bell,* 687 F.2d 684, 702 (3d Cir.1982), *aff'd,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984); *see also Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983).

**3.** If there is any genuine doubt whatever of the "ripeness" of this case, *see* Court's Opinion at 296–99, the instant dismissal solution is surely an arbitrary, wholly unwarranted response. The notion that this case is "fictitious," "hypothetical," meet only for a law school exam, *id.* at 296, 297, and so "not ripe" for adjudication, surfaces for the very first time in my

It does not answer DKT's constitutional objection to say that the domestic NGO can go it alone, that DKT can spend its own (privately-raised) funds abroad as it will. *See* Brief for Appellees–Cross–Appellants at 34 (acknowledging that cutting off domestic NGOs from all AID funds if they deal with foreign NGOs that offer abortion-related services would effectively punish domestic NGOs "for exercising their constitutional rights of free speech and free association in conjunction with foreign NGO[s]"). A reality not debated by AID attends the grave question whether our government, without offense to the first amendment, can deprive DKT of its foreign partners through the lure of AID funds.[4] As recognized by the district court: " '[F]ew foreign family planning programs of any magnitude can be conducted by domestic organizations without the assistance of foreign organizations.' " 691 F.Supp. at 404 (quoting Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and Reply to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment at 36).

The prominence of AID in population control assistance abroad is apparent. Through AID, "the United States continues to be the largest single donor of international population assistance, contributing more than 40 percent of the total $500 million provided by all donors in 1986."

Declaration of John J. Dumm, Deputy Director of the Office of Population of AID, December 30, 1987, at 5, *reproduced in* Joint Appendix at 123. AID confirms that "more population assistance continues to be provided through nongovernmental organizations than through foreign governments." *Id.*

Several domestic NGOs, filing as amici in this case, observed that "foreign NGOs that are the most respected and prominent spokespersons on family planning issues in their own countries—and therefore the most effective partners for [organizations like] DKT—are also AID recipients, because the U.S. organizations have selected them for subgranting as best able to use resources successfully." Brief of Amici Curiae at 15. Furthermore, "[e]ven foreign NGOs that do not now receive AID funds are reluctant to work with [domestic NGOs on abortion-related services], because the foreign NGOs hope to receive AID funds in the future." *Id.* at i; *see supra* note 1. The government labels "voluntary," however, the decision of a foreign NGO to decline to participate in abortion-related projects in order "to associate with the U.S. population planning program." Reply Brief for Appellees–Cross–Appellants at 12. The label "voluntary," as unconstitutional condition doctrine makes plain, obscures or begs the question: may

brethren's extended essay. Ripeness was not raised by AID, nor was it considered by the district court. This is altogether understandable, for last time around, we instructed the district court to attend to the issue of standing with dispatch, then the sole remaining threshold issue, so that "the parties may address ... [the plaintiffs'] substantive challenges." *DKT Memorial Fund, Ltd. v. AID,* 810 F.2d 1236, 1239 (D.C.Cir.1987).

It is a matter of simple justice in our system for a party to be given fair notice and an opportunity to be heard before the boom is lowered. *Cf. Harman v. Valley Nat'l Bank,* 339 F.2d 564, 567 (9th Cir.1964) (lack of detail does not warrant complaint dismissal where there is a prospect for requesting and obtaining pretrial a more definite statement). Plaintiffs have not had that fair opportunity here. It defies reason to say that plaintiffs having had ample opportunity to address the sole threshold issue in view—standing—and having done so with substantial success, they are not to be tossed out

peremptorily with no opportunity ever to explain why their cause is indeed ripe. *Compare supra* note 1 *with* Court's Opinion at 298. *See also* 28 U.S.C. § 1653 (amendment of pleadings to show jurisdiction may be allowed in trial or appellate courts). To test the validity of a view raised by a judge *sua sponte,* the parties ought generally to be invited to address the matter through supplemental briefing. *See, e.g., Siegelman v. Cunard White Star, Ltd.,* 221 F.2d 189, 197 (2d Cir.1955); *cf. Sanders v. International Ass'n of Bridge, Structural and Ornamental Iron Workers,* 546 F.2d 879, 882 (10th Cir.1976); *Kanelos v. Kettler,* 406 F.2d 951, 954–55 n. 15 (D.C.Cir.1968).

4. My colleagues refer to those who take the U.S. dollars and the pledge that goes with it as "DKT's fair-weather foreign associates." Court's Opinion at 294. I would not so characterize the hard decision confronting foreign NGOs operating in communities with poverty so dire and conditions for women so low we cannot comprehend their situation.

AID, in full view of the predictable effect on domestic NGOs like DKT, and compatibly with constitutional constraints, put foreign NGOs to Hobson's choice.

The first amendment secures to persons in the United States the respect of our government for their right to communicate and associate with foreign individuals and organizations, as well as with individuals and organizations stateside.[5] Indeed, the first federal law the Supreme Court ever held violative of the first amendment involved a condition on international correspondence—a restraint on delivery of mail from abroad. *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (invalidating statute that required Post Office to detain and deliver only on addressee's recorded request foreign mailings of "communist political propaganda"); *see Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 509 n. 9 (9th Cir.1988) (" '[T]here can be no question that, in the absence of some overriding governmental interest such as national security, the First Amendment protects communications with foreign audiences to the same extent as communications within our borders.' ") (quoting and affirming 646 F.Supp. 492, 502 (C.D.Cal.1986)).

DKT's case rests on the freedom to communicate, to receive communications, and to maintain associations, at home and abroad, that United States residents enjoy vis-a-vis the United States government. Abortion counseling compatible with governing law is sheltered speech, just as anti-abortion counseling is. *See Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). But DKT's right to inform and to counsel on lawful access to abortion is surely diminished, and the employment of the organization's own resources is surely restrained, when our government denies benefits to, or with-

draws benefits from, foreign organizations that find DKT's speech persuasive and therefore would join DKT in informing and counseling women in need about abortion allowed by law. *Cf. Riley v. National Fed'n of the Blind, Inc.,* — U.S. —, 108 S.Ct. 2667, 2680 n. 13, 101 L.Ed.2d 669 (1988) (licensing requirement for professional fundraisers for charities held to violate first amendment rights of charities because "[r]egulating these fundraisers . . . affects the speech of the clients or causes with which they are associated"); *Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 1892, 100 L.Ed.2d 425 (1988) (prohibition on paying circulators of initiative petitions impermissibly restricts political expression because "it limits the number of voices who will convey [the proponents'] message . . . and, therefore, limits the size of the audience they can reach").

## II.

Endeavoring to establish that, in this instance, our government can "manipulate[ ] out of existence" "guaranties [of freedom of speech and association] embedded in the Constitution of the United States," *see Frost & Frost Trucking Co. v. Railroad Comm'n,* 271 U.S. 583, 594, 46 S.Ct. 605, 607, 70 L.Ed. 1101 (1926), government counsel cites cases that are readily distinguished. One so featured case is *Lyng v. International Union, UAW,* 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988), which upheld a Food Stamp Act provision denying eligibility to households that had become needy because a household member was on strike. The Court there rejected claims that the provision unconstitutionally impinged upon rights of free speech and association by deterring worker-union solidarity and driving strikers out of their family abode. The Court stressed, however, that

---

**5.** My colleagues question the constitutional right of organizations, as distinguished from individuals, to associate together. *See* Court's Opinion at 294–95. Each organization, however, can advance the rights of the individuals it represents. It is not revealed to me why, in this instance, the whole (the organization) should count for less than the sum of its parts (its members and supporters). *Cf. Brown v. Social-*

*ist Workers '74 Campaign Comm.,* 459 U.S. 87, 98, 103 S.Ct. 416, 423, 74 L.Ed.2d 250 (1982) ("the First Amendment interests of minor parties and their members and supporters" bar disclosure of campaign disbursements; naming disbursement recipients could cause reprisals hindering routine commercial transactions of those with whom minor party organizations deal).

the projected effects on family living arrangements and union affiliation were, as a practical matter, "exceedingly unlikely" to result from the challenged government action. *Id.* 108 S.Ct. at 1189, 1190 (quoting *Lyng v. Castillo,* 477 U.S. 635, 638, 106 S.Ct. 2727, 2728, 91 L.Ed.2d 527 (1986)). Indeed, even the dissenters did not find government "coercion" present. Instead, they maintained that the provision so ineffectively served the government's asserted ends that it lacked rationality. *See id.* 108 S.Ct. at 1198–2000 (Marshall, J., dissenting). Furthermore, the *Lyng* Court found critical to its decision the congressional objective to avoid the perception of government partiality, the appearance through food stamp subsidization of "undue favoritism to one side ... in private labor disputes." *Id.* 108 S.Ct. at 1192. Here, it cannot be said that the "deterrent effect" on foreign NGO association with DKT is "unlikely," *see supra* pp. 300–03, nor is the government motivated by a concern to maintain neutrality, to avoid any tilt toward one or another contending party.

Neither *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), nor *Palestine Information Office v. Shultz,* 853 F.2d 932 (D.C.Cir.1988), stands for any broad rule that our government may impede as it will the international communications and associations of U.S. residents. The former case involved denial of a visa to a Belgian Marxist invited to attend academic conferences in the United States; the Court underscored that upholding the government's action there turned precisely on the "plenary congressional power to make policies and rules for exclusion of aliens." 408 U.S. at 769–70, 92 S.Ct. at 2585.[6] The latter case trained on the government's large interest in severing ties with a terrorist organization, an interest which outweighed the plaintiffs' asserted free speech right to act as the foreign mission of the Palestine Liberation Organization. We stressed there that the office closing ordered by the State Department did not prevent any parties "from expressing any thought or making any statement they could have made before" the closure; instead, the contested order simply and only blocked the complainants "from speaking *in the capacity of a foreign mission of the PLO."* 853 F.2d at 939 (emphasis in original).

### III.

As earlier indicated, *see supra* p. 299, government may proscribe use of public funds to perform abortions. *Webster v. Reproductive Health Servs.,* — U.S. —, — – —, 109 S.Ct. 3040, 3050–53, 106 L.Ed.2d 410 (1989); *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).[7] But that authority does not over-

---

**6.** The government claims there is no meaningful distinction between denying a nonresident alien entry into the United States and denying one entry into the AID assistance program. Reply Brief for Appellees–Cross–Appellants at 3–4. The Court stated, however, that "the power to exclude aliens is 'inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers.'" *Mandel,* 408 U.S. at 765, 92 S.Ct. at 2583 (quoting Brief for Appellants at 20). The same cannot be said of AID foreign assistance. "Deportation and immigration cases stand on a special footing" and, like cases involving the rights of aliens in wartime, "involve considerations not present here." *Cardenas v. Smith,* 733 F.2d 909, 916 (D.C.Cir. 1984).

**7.** I do not fathom why my colleagues spend pages establishing this well-established proposition. *See* Court's Opinion at 286–90. Given prevailing precedent, plaintiffs cannot and do not complain of a refusal to fund abortion-relat-

ed services. While my brethren indeed "belabor" this non-issue, *see* Court's Opinion at 290, they remarkably fail to notice the great care the Supreme Court twice took to distinguish a case like this one. In *McRae* the Court recognized that

> [a] substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised [with resources other than Medicaid] her constitutionally protected freedom to terminate her pregnancy by abortion. This would be analogous to *Sherbert v. Verner....*

448 U.S. at 317 n. 19, 100 S.Ct. at 2688 n. 19. Similarly, in *Maher v. Roe,* 432 U.S. 464, 474–75, n. 8, 97 S.Ct. 2376, 2383 n. 8, 53 L.Ed.2d 484 (1977), the Court said:

> If Connecticut denied general welfare benefits to all women who had obtained abortions and who were otherwise entitled to benefits, we would have a close analogy to the facts in

ride the right of members of the U.S. polity to use their own funds to advocate, counsel, or encourage abortion as a facet of comprehensive world population planning. *See Commonwealth of Massachusetts v. Secretary of Health & Human Servs.*, No. 88–1279, slip op. at 56–59 (1st Cir. May 8, 1989) (Torruella, J., concurring in part). The Supreme Court indicated in *Regan v. Taxation With Representation (TWR)*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), how peaceful coexistence or accommodation of government authority and private right can be achieved. In that case, the Court upheld government subsidization of the political lobbying of veterans' organizations, but of no other organizations, through rules allowing only veterans' organizations to use tax-deductible contributions for lobbying. But the Court hardly opened the door to government inhibition of lobbying with private funds by organizations that received public subsidies for other activities. On the contrary, as cogently explained in commentary:

> The structure of the Internal Revenue Code made it possible [for government to respect political expression by diverse private entities without either subsidizing or inhibiting it], since the Code permitted organizations eligible for tax-deductible contributions under § 501(c)(3) to retain that status while setting up financially independent but wholly controlled § 501(c)(4) lobbying arms that would conduct lobbying directed by their § 501(c)(3) affiliates but funded without benefit of any taxpayer-assisted dollars.

L. TRIBE, AMERICAN CONSTITUTIONAL LAW 784 (2d ed. 1988). The commentary concludes that this bifurcated arrangement, which the Supreme Court noted, 461 U.S. at 544, and the concurring opinion emphasized as crucial, *id.* at 552–53 (Blackmun,

J., concurring), "should be regarded as indispensable to the *Regan v. TWR* holding." L. TRIBE, *supra*, at 784.

Accommodation of the very same order has been made regarding abortion-related programs of domestic NGOs and with respect to foreign government population programs. *See supra* pp. 299–300. Those entities may receive federal funds for non-abortion related family planning so long as they segregate the United States funds from abortion-related expenditures.[8] Indeed, as earlier observed, *see supra* p. 302, the government recognizes that cutting off domestic NGOs from all AID funds if they deal with foreign NGOs that offer abortion-related services would amount to punishing domestic NGOs "for exercising their constitutional rights of free speech and free association in conjunction with foreign NGO[s]." *See* Brief for Appellees–Cross–Appellants at 34. It is possible to deny to foreign NGOs the essential accommodation made to foreign governments and domestic NGOs only if two premises are indulged. First, one must hold that the Constitution —or, at least, the first amendment in significant measure—does not follow the flag when U.S. officials deal with foreign persons. Second, and most vital to my analysis, one must agree that the first amendment does not stop AID from handicapping or burdening domestic NGOs by instructing the foreign NGO: as a condition of any U.S. family planning grant, you must "shun [U.S. private organizations like DKT] to the extent [they] seek[ ] an alliance with you to provide abortion counseling." *See supra* p. 301.

It is too late in the day to argue that the segregated funds solution is illusory because any United States funding "frees up" funds from other sources. It is now settled that when

---

*Shapiro* [*v. Thompson* ], and strict scrutiny might be appropriate....

Just as a privately-funded abortion should not render one ineligible for all Medicaid benefits, so the privately-funded abortion counseling of the plaintiffs here should not render them ineligible for non-abortion related family planning grants.

**8.** It is simply not true that our government makes a "single-voiced statement" on this for-

eign affairs question. *But see* Court's Opinion at 289, 291 (supposing a "necessity" for the nation to speak on this topic with a single voice). We speak one way to domestic NGOs, the same way to foreign governments, but break away from that single-voiced statement when addressing foreign NGOs.

the government makes the availability of funding dependent upon the restriction of activities paid for through private sources, the government requirements then become impermissible penalties on protected expression. *FCC v. League of Women Voters*, 468 U.S. 364, 399–401, 104 S.Ct. 3106, 3127, 82 L.Ed.2d 278 (1984)....

. . . .

Recent abortion-related cases further emphasize this point. Courts consistently have struck down regulations which attempt to curtail constitutional activities funded through private sources, by making federal grants and subsidies conditional upon the termination of these activities.

*Commonwealth of Massachusetts v. Secretary of Health & Human Servs.*, slip op. at 57, 58 (Torruella, J., concurring in part, joined by Selya, J.) (several citations omitted).

The Supreme Court's 1986 summary affirmance in *Planned Parenthood v. Arizona*, cited *supra* p. 300, confirms the lower court consensus. In that case, Planned Parenthood successfully sought an injunction against a state law prohibiting state funds for family planning "to agencies or entities which offer 'abortions, abortion procedures, counseling for abortion procedures or abortion referrals.' " 789 F.2d at 1349–50 (quoting 1980 Ariz.Sess.Laws 842, 860 n. *). The state urged that the encompassing prohibition was necessary to assure the efficacy of the ban on use of state funds for abortion-related services. *Id.* at 1350–51. The Ninth Circuit, however, observed that Planned Parenthood had previously "successfully segregated state funds from its abortion-related expenditures." *Id.* at 1351. That court firmly rejected the position that *"any* expenditure on abortion-related activities necessarily is derived from state funds" to the extent that those funds constitute a portion of the recipient's budget. *Id.* at 1350 (emphasis in original).

### IV.

Even if the first amendment comes into play because of the handicap or burden placed on the speech and associations of DKT and like-minded domestic NGOs, the government maintains, the Mexico City Policy reflects a superior interest: the "worldwide view" shared by countries round the globe, of the respect society owes to "human life at its most vulnerable, human life still unborn." Reply Brief for Appellees–Cross–Appellants at 13, 14 (quoting from 23 WEEKLY COMP.PRES.DOC. 879–80 (July 30, 1987)). "It must be remembered," the government cautions, "that abortion is illegal in many countries and is repugnant to the cultural and moral values of large segments of the world population with whom the United States must conduct its foreign affairs." *Id.* at 14.

I do not reach the question whether a policy tailored to avoid offending our neighbors in the world community would pass muster. The policy here at issue is not so refined. Strikingly overbroad, it encompasses relations with NGOs in countries where abortion is legal, where abortion-related services are regarded as a necessary last resort given current conditions of poverty, ignorance, physical insecurity, and fear in which many women live. While a purpose to avoid antagonizing foreign nations is not rationally served by a gross approach, just such a purpose is advanced by segregated accounts, as the framers of the Mexico City Policy recognized when they stated: "[W]hen dealing with nations which support abortion with funds not provided by the United States Government, the United States will contribute to such nations through segregated accounts which cannot be used for abortion." Mexico City Policy Statement at 4–5.

The government additionally objects that the segregated accounts solution "would render the Mexico City Policy redundant," for "all NGO[s] are forbidden by 22 U.S.C. § 2151b(f) from using U.S. funds for abortion or promotion of abortion and appellants do not challenge that prohibition." Brief for Appellees–Cross–Appellants at 37. But the Mexico City Policy itself draws no distinction between foreign and domestic NGOs. It reads: "[T]he United

States will no longer contribute to separate non-governmental organizations which perform or actively promote abortion as a method of family planning in other nations." Mexico City Policy Statement at 5. AID thought it compatible with that policy and with constitutional limitations to allow domestic NGOs to counsel abortion abroad so long as they use no U.S. grant funds for that activity. It would be no less compatible with our national policy and Constitution to read the same words as meaning the same thing when applied to each "separate nongovernmental organization[ ]," whether domestic or foreign. *See Planned Parenthood Fed'n v. AID*, 838 F.2d 649, 656 (2d Cir.1988) (Mexico City Policy Statement "could be implemented in a number of alternative ways without compromising AID's policy, such as contributing to NGOs through segregated accounts, as AID does in its government-to-government dealings").

In sum, once it is recognized that our government may not stop domestic NGOs from counseling abortion abroad with funds they raise privately, it follows that government may not impede, without compelling cause, the domestic NGO's access to an audience, adherents, and associates among foreign NGOs. Because AID's present policy does so block domestic NGOs from fruitful communication and association, I would hold that policy incompatible with the first amendment.

## V.

My analysis of the rights of the domestic organization DKT would resolve the instant controversy completely, rendering it unnecessary to decide whether the first amendment limits the actions of U.S. officials in their dealings with foreign parties, here PSS and PSE.[9] Because both my colleagues and the district court addressed that issue and ruled against the foreign NGO's claims to constitutional protection, I will indicate briefly why I find that disposition troublesome.[10]

If our land is one "of freedom, of equal opportunity, of religious tolerance, and of good will for other peoples who share our aspirations," it is in no small measure so because our Constitution restrains all officialdom from infringing on fundamental human rights; just as our flag "carries its message ... both at home and abroad," so

9. I part ways with the district court on the scope of relief in order. That court concluded, incorrectly in my judgment, *see infra* note 10, that the foreign plaintiffs PSE and PSS "lack standing." Tied to its ruling on "standing," the district court's injunction, as amended, reaches foreign NGOs as sub-grantees, but not as direct grantees. The adverse impact of AID's policy on domestic NGOs, however, is not limited to sub-grant situations. AID picks off or buys up DKTs potential associates abroad when it signs them up—subject to their exhaustive anti-abortion pledge—as grantees, just as it does when it allows them—subject to the same pledge—to be sub-grantees. I would therefore extend the injunction to cover AID contracts with foreign NGOs as direct grantees.

10. I am unable sensibly to distinguish the court's "standing" and "merits" dispositions. The two become one under the "merits first" approach adopted, *i.e.*, first the court decides the foreign NGOs "had no First Amendment rights," therefore the court concludes those NGOs had "no standing to assert a violation of such rights." Court's Opinion at 279 (reporting district court's conclusion "that the foreign plaintiffs had no First Amendment rights and therefore no standing to assert a violation of

such rights"); *id.* at 284 (this court opens discussion of standing with recitation of "principle that nonresident aliens are without First Amendment rights"), *id.* at 286 (court restates that under "zone of interest test," disposition of standing "may be informed by an examination of the merits of the claim"). *But cf. Women's Equity Action League v. Cavazos*, 879 F.2d 880 (D.C.Cir.1989) (distinguishing the issue of "standing" from the question whether plaintiffs have a viable claim for relief).

Nor do I see how this case can be fitted into the *Laird v. Tatum*, 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972), mold. *See* Court's Opinion at 297, 299. In that case, plaintiffs who objected to the Army's domestic surveillance program identified no imminent harm to themselves. Indeed, their counsel stated at oral argument that plaintiffs would suffer no "chill," but sought to represent the rights others more easily intimidated or "chilled." Plaintiffs here, by contrast, do assert imminent injury to themselves. They do not attempt to redress the rights of others but claim that others will be coerced by financial considerations to avoid association with them. Bread-and-butter economics, in short, not subjective or psychological chill, serves as the foundation for their claim. *See supra* note 1.

does our Constitution and the values it expresses. *Cf. Texas v. Johnson,* —— U.S. ——, 109 S.Ct. 2533, 2556, 105 L.Ed.2d 342 (1989) (Stevens, J., dissenting). In an endeavor to restate United States law in point, the American Law Institute has published this black letter text:

#### APPLICABILITY OF CONSTITUTIONAL SAFEGUARDS

The provisions of the United States Constitution safeguarding individual rights generally control the United States government in the conduct of its foreign relations as well as in domestic matters, and generally limit governmental authority whether it is exercised in the United States or abroad, and whether such authority is exercised unilaterally or by international agreement.

Restatement (Third) of Foreign Relations Law of the United States § 721 (1987). True, the matter "has not been authoritatively adjudicated" in respect of aliens outside the United States. *Id.* § 722 comment m & reporters' note 16; *see also id.* § 721 comment b & reporters' notes 1 and 2. There is, however, continuing support for the ideal that "wherever the United States acts, 'it can only act in accordance with the limitations imposed by the Constitution.'" *Id.* § 721 reporters' note 1 (quoting *Reid v. Covert,* 354 U.S. 1, 6, 77 S.Ct. 1222, 1225, 1 L.Ed.2d 1148 (1957) (plurality opinion of Black, J.)); *see United States v. Tiede,* 86 F.R.D. 227 (U.S. Court for Berlin 1979) (foreign national accused of hijacking Polish aircraft abroad was tried under German substantive law in Berlin in a court created by United States; U.S. court held foreign national entitled to jury trial as a matter of constitutional right). I would hesitate long before holding that in a United States-foreign citizen encounter, the amendment we prize as "first" has no force in court.

#### CONCLUSION

The handicap our government has placed on DKT's speech and associations is repug-

nant to the first amendment. I therefore dissent from the court's judgment.