**TINOUSI JENNINGS, Appellant**

**v.**

**JACK THOMPSON and ELIZA THOMPSON, Appellees**

High Court of American Samoa
Appellate Division

AP No. 13-92

December 7, 1994

Before CANBY,* Acting Associate Justice, MUNSON,** Acting Associate Justice, and WARD,*** Acting Associate Justice

Counsel: For Appellant, Charles V. Ala'ilima
 For Appellees, Roy J.D. Hall,

MUNSON, Acting Associate Justice:

This appeal[1] concerns title to approximately 3.5 acres of land in Pava'ia'i, on the island of Tutuila. the trial court held in favor of Jack and Eliza Thompson.[2]

A recitation of the facts is necessary for a full understanding of all that has transpired. On December 13, 1948, Pule, Matai of the Pule family, for himself and Pule family, conveyed title to the disputed land to Jack Thompson, as his individually-owned land, for the sum of $800. Jack Thompson is three-quarters Samoan blood. On April 25, 1949, the Land Commission recommended to the Governor that he approve the sale, which he did, in accordance with then-existing law. The deed was recorded with the Territorial Registrar.

On July 31,1950, Jack Thompson signed a Deed of Conveyance, transferring the land to his father-in-law, Alexander Eli Jennings, as Alexander's individually-owned land, for consideration of one dollar, Alexander Jennings, Eliza's father, was one-half Samoan blood. Neither the Land Commission nor the Governor approved this deed, but it was

---

* Honorable William C. Canby, Jr., Circuit Judge, United States Court of Appeal for the Ninth Circuit, serving by designation of the Secretary of the Interior.

** Honorable Alex R. Munson, Chief Judge, United States Court of Appeal for the Ninth Circuit, serving by designation by the Secretary of the Interior.

*** Honorable John L. Ward, II, Judge, District Court of American Samoa, serving by designation of the Secretary of the Interior.

[1] Two separate actions were consolidated below for trial, Civil Action No. 11-84, and Land and Titles No. 54-90.

[2] The trial court denied appellant's request to award her an undivided 2/15s interest in the land, to evict appellee, to change the Territorial Registrar's records regarding ownership of the land, to impose a constructive trust on appellee's property, and to enjoin appellees from making further improvements on the land and for $10,000 in punitive damages,

somehow recorded with the Territorial Registrar. Jack Thompson testified that he did not realize that he was signing a deed. He claimed that Alexander had always told him that he would watch over the land when Jack, who was serving with the U.S. Navy, was assigned elsewhere. Jack Thompson said that Alexander only showed him the second page of what later proved to be a deed; and told him he needed to sign it to give Alexander permission to look after the land in Jack's absence.

Between July, 1950, and his death in 1958, Alexander built a small house on the land, but it was never used as his family's primary dwelling.

Probate of Alexander's estate began in 1958 and the subject land was included as an asset of his estate. by court order dated July 26, 1962, the final distribution was made. Each of Alexander's surviving children received an undivided 2/15s interest in the property (including appellant Tinousi's husband, David), as did the heirs of Alexander's daughter Zilpher, who had predeceased him.[3]

Jack Thompson testified that he did not know the land was included in Alexander's estate until 1962, when the estate was probated.

A transcript of the proceedings in the 1962 probate shows that both Eliza (appellee) and her brother, David (appellant's deceased husband), were present and from their comments at the hearing both knew that the property was included in Alexander's estate.

David and Tinousi Jennings married in July, 1962. From 1964 until 1967 they lived in the small house which Alexander had built on the disputed land. Tinousi testified that David had told her that it was Alexander, not Jack, who had purchased the land for $800 from Pule in 1948. David told her Alexander could not register the land because he was only half Samoan blood and thus could not own land in 1948. David claimed Alexander had the land registered in Jack's name, because Jack was three-quarters Samoan. Shortly after the law changed in 1949, Alexander asked Jack to reconvey the land to him, which Jack did by the 1950 deed.

Eliza and Jack Thompson returned to American Samoa to live in 1968 and 1969, respectively. When Eliza preceded Jack to Samoa she moved

---

[3] Alexander's wife apparently received the remaining 5/15s interest in the land.

in to the house on the land. She and Jack have lived on the land continuously since 1968, and have built two more houses, a small store, and a tennis court.

Tinousi claimed that she first learned of Jack and Eliza's claim to the land in 1968. However, the evidence at trial showed that neither she nor any other member of her family objected to the Thompson's claim until 1975, when Tinousi sought to build a house on the land but was refused buy the Thompson.

After the dispute with Tinousi arose in 1975, Jack Thompson in 1976 obtained a deed to the land, executed by Wallace H. Jennings, on e of Alexander's sons, as "Trustee of the Estate of Alexander E. Jennings, Deceased."

After trial, the court made several rulings based on its findings. the trial court first found the 1976 deed invalid. the court held that because Wallace was not the trustee of his father's estate he had no legal authority to execute the 1976 deed to Jack and Eliza Thompson.

In considering the conflicting versions of the facts relating to the 1948 and 1950 deeds, the trial court found that the evidence supporting Jack Thompson's version of events was clear and convicting, The court found that under the law in 1948, Jack Thompson could own land but Alexander could not, since the former was three-fourths Samoan blood and the latter only one-half (and the court found no compelling evidence to support appellant's claim that Jack and Alexander had conspired in 1948 to circumvent Samoan land ownership law). The fact that Alexander had access to other, family-owned land upon which to build and live and Jack did not also favored Jack's account of the acquisition of the land in 1948, as did the fact that the 1950 deed had never been approved by the Land Commission or the Governor.

The court found that Alexander's 1950 acquisition of the land had come about in one of two ways. Either Alexander had induced Jack to sign the deed through constructive fraud or undue influence by playing on the family ties, or there was an implied promise by Alexander to reconvey to Jack and Alexander had reneged on the agreement. The court deemed the evidence sufficient to support either construction of the facts. Having found that, the trial court imposed a constructive trust on Alexander to convey to Jack. The court found that upon Alexander's death the constructive trust was borne by his estate and, in turn, by the distributees after the 1962 probate.

Having concluded its analysis, the trial court canceled the 1950 deed and ordered that title to appellant's undivided 2/15s interest in the title should be vested in Jack Thompson through the valid 1948 deed.

## ISSUES ON APPEAL

Appellant raises five issues on appeal: whether or not the trial court erred by treating the constructive trust (which had been dominated an affirmative defense) as a counterclaim; whether the trial court failed to join indispensable parties; whether estoppel by deed should have prevented Jack Thompson from denying the validity of the 1950 deed; whether the equatable doctrine of laches should have been applied to this fact situation; and, whether the evidence establishing fraud and the existence of a fiduciary duty was sufficiently clear and convincing to warrant imposition of the constructive trust.

## ANALYSIS

■ As to the first issue, appellant concedes that it is within the court's discretion to treat the claim for imposition of a constructive trust, misdesignated as an affirmative defense, as if it had been properly pleaded as a compulsory counterclaim. Trial Court Rule of Civil Procedure 8(c) provides for such treatment and there was no real prejudice to appellant. Accordingly, we find that the trial court did not abuse its discretion and the decision is AFFIRMED as to this issue.

In its July 22, 1992, decision on appellant's motion for reconsideration or a new trial, the court agreed with appellant's assertion that the court's order was too broad, because it affected property rights of persons not before it, to wit, all the remaining heirs of Alexander whose interests in the land, derived from the 1962 probate of Alexander's estate, would be affected by the court's decision. Appellant's lawsuit had sought an adjudication only of her 2/15s interest in the land. The court deemed it appellees' responsibility to attempt to join all other interested parties or the court's order regarding the land would of necessity be limited to the undivided 2/15s interest claimed by appellant Tinousi Jennings.

■ We find that the trial court's judgment as to any interest of appellant in the land is final, and that she lacks standing to argue the

indispensability of other parties.[4] A court may refuse to determine the merits of a claim on the ground that, even though the claim may be correct, the litigant advancing it is not properly situated to be entitled to its judicial determination. *See, e.g. DKT Memorial fund Ltd. v. Agency for Int. Dev.*, 887 F.2d 275, 283 (D.C. Cir. 1989). Standing focuses on the party and not the issue to be adjudicated. *Flast v. Cohen*, 392 U.S. 83, 99, (1968). The issue of possible claims by other heirs of Alexander, while potentially problematic, must remain for another day, as we discuss below.

■ Appellant argues that the trial court erred by basing its decision on equitable estoppel, rather than estoppel by deed. However it is characterized, the estoppel argument is not persuasive. Appellant asks us to find estoppel by deed when the trial court found that Jack Thompson's signature on the 1950 deed had been obtained through trickery. We accept appellant's argument we would be countenancing an illegal transaction, since accepting her version of the facts would compel us to ratify Jack and Alexander's purported 1948 attempt to circumvent the blood requirements of Samoan law.

■ Appellant next argues that the doctrine of laches should have been applied to prevent appellees from claiming title to this property. Laches is an equitable doctrine and, as such, its application depends on the facts of each case. *Brown v. Continental Can*, 765 F.2d 810814 (9th Cir. 1985). Generally, laches will be found where there is an unexcused or unreasonable delay by one party in asserting his or her rights, and a concomitant prejudice to the other party.

■ The time-honored equity maxim that one who seeks equity must do equity applies forcefully here because the laches argument cuts both ways: Appellant failed to pursue her alleged right to the property for several years (from at least 1968 to the filing of her first lawsuit in 1983), which certainly acted to the prejudice of appellees, appellees' open and notorious possession of the land from 1968 onward put appellant on notice of their claim. As an equitable defense, laches is committed to the sound discretion of the trial court, and reviewed for an abuse of that discretion. *A.C. Aukerman Co. v. Chaides Const.*, 960 F.2d 1020 (Fed. Cir. 1992). We will not reverse unless we have a definite and firm conviction that the court below committed a clear error

--------

[4] Indeed, appellant's argument about the indispensability of the other parties rings somewhat hollow, given the fact that she could have included them in her lawsuit and, for whatever reason, did not do so.

of judgment in the conclusion it reached upon a weighing of relevant factors, *United States v. Plainbull*, 957 F.2d 724, 725 (9th Cir. 1992), and we will not substitute our judgment for that of the lower court. *United States v. BNS.*, 858 F. 2d 456, 464 (9th Cir. 1988).

We cannot say that, given the facts before it, the trial court committed a clear error of judgment in the conclusion it reached. Equity aids the vigilant. Neither appellant nor appellees zealously pursued their competing claims to the property through legal channels, but appellees' presence on the property since 1968 certainly put appellant on notice of their claim. We will not alter the trial court's conclusion on that issue.

Finally, the trial court imposed a constructive trust on Alexander and, in turn, his estate and its distributees, after having found that Alexander had either a fiduciary duty to reconvey the land or that he had breached an implied promise to do so.

 A constructive trust is a remedy used by a court of equity to compel a person who has acquired property to which he is not justly entitled to transfer it to the person entitled thereto. *See, e.g., Haskel Eng. & Supply Co. v. Hartford Accid. & Indem.*, 144 Cal.Rptr. 189 (Cal.App.1978); *Calistoga Civic Club v. City of Calistoga*, 191 Cal.Rptr. 571 (Cal.App. 1983). "The wrongful act giving rise to a constructive trust need not amount to fraud or intentional misrepresentation. All that must be shown is that the acquisition of the property was wrongful and that the keeping of the property by the defendant would constitute unjust enrichment." *Calistoga Civic Club*, 191 Cal. Rptr. at 576. A constructive trust may arise from violation of a fiduciary duty, such as where the property is obtained by constructive fraud or undue influence. *See* WITKIN, SUMMARY OF CALIFORNIA LAW §308 (9th ed. 1990). Where there is a preexisting fiduciary relationship between the parties, a person whose property has been taken is entitled to restoration of the property itself. *Heckmann v. Ahmanson*, 514 Cal.Rptr. 177 (Cal.App. 1985). Both Restatement of Trust 2d §44 and Restatement of Restitution §182 approve the imposition of a constructive trust where the transfer was procured by fraud or where the transferee was in confidential relation to the transferror.

## CONCLUSION

Given the facts as the trial court found them to be, we cannot say that the court erred as a matter of law in fashioning the remedy of constructive trust to undo a forty-year-old wrong and finally clear at least a portion

of the title to the land. Our consideration of this issue is constrained by our recognition that the judges in the trial court had the opportunity to listen to the witnesses, to observe their demeanor as they testified, and to make judgments as to their veracity and credibility.

FOR THE REASONS SET FORTH ABOVE, the judgment of the trial court is AFFIRMED as to appellant. We join in the trial court's admonition to appellees to promptly resolve, whether by quitclaim deed, further litigation, or otherwise, any and all questions concerning the remaining undivided interests. We note, again, however, that appellees' victory is but a partial one. As the trial court ruled, appellees must expeditiously seek to quiet title to the remaining undivided interests which have not yet been adjudicated in this proceeding. Until they have done so, they will continue to suffer uncertainty as to their full ownership.

It is so ordered.